José M. Jarabo y su esposa María Teresa Pérez Morris, demandantes y recurridos, *v.* Dr. Max Ramírez de Arellano, demandado y recurrente.

*Número:* R-62-158    *Resuelto:* 30 de junio de 1966

*Francisco Ponsa Feliú* y *Álvaro Calderón, Jr.*, abogados del recurrente; *F. Fernández Cuyar* y *Amancio Arias Cestero*, abogados de los recurridos.

Sala Primera integrada por su Presidente el Juez Asociado Señor Pérez Pimentel y los Jueces Asociados Señores Hernández Matos, Rigau y Dávila.

PER CURIAM: Los esposos José M. Jarabo y María Teresa Pérez Morris instaron acción ante la Sala de San Juan del Tribunal Superior contra el doctor Max Ramírez de Arellano y la Insurance Company of North America, reclamándoles el pago de $200,000.00, importe de los daños y perjuicios que alegaron haber sufrido con motivo de un accidente de automóviles ocurrido en la Avenida Ponce de León de Santurce el 7 de mayo de 1960.

Contestaron los demandados la demanda admitiendo la ocurrencia del accidente, negando que éste se debiera a la negligencia del codemandado Ramírez de Arellano y que el vehículo de Jarabo sufriese serios desperfectos y admitiendo que éste sufrió lesiones físicas. Alegaron como defensas que la demanda dejaba de exponer una reclamación y que "el accidente descrito en la demanda fue uno puramente desgraciado y fortuito, que ocurrió sin que mediase culpa, descuido o negligencia alguna del co-demandado, doctor Max Ramírez de Arellano."

El juicio fue celebrado durante los días 26 de setiembre de 1961 y 19 de febrero de 1962, aportando cada parte prueba oral y documental bastante extensa. Se falló el pleito por sentencia de fecha 15 de mayo de 1962 que declaró con lugar la demanda, fijando la suma a pagar en $62,969.52, de la cual

pagaría la Insurance Company of North America $30,108.26. Posteriormente, a petición de esta codemandada, se redujo a $25,000.00 la parte del principal de la sentencia a satisfacer por ella.

Contra esa sentencia sólo ha pedido revisión el codemandado Ramírez de Arellano representado por letrados distintos a los que tuvo en el Tribunal de instancia.

Por su parte la codemandada Insurance Company of North America, poco después de instado el recurso de revisión, "en concepto de pago y satisfacción total de las obligaciones impuestas a la codemandada—a ella— . . . en la sentencia . . . modificada . . ." consignó la suma de $25,264.44 para beneficio de los demandantes en la secretaría del Tribunal a quo, habiéndosele hecho entrega de ese suma consignada a los demandantes el 25 de junio de 1962.

El 13 de julio de 1962, por resolución de mayoría, una Sala de este Tribunal negó la revisión del fallo recurrido, empero, luego a base de una moción de reconsideración, decidió librarlo haciendo constar uno de sus jueces que debía librarse "a los únicos fines de revisar el importe de la compensación concedida."

El recurrente sostiene que el Tribunal sentenciador erró (A) al resolver que fue negligente; (B) al no aplicar la doctrina de la emergencia súbita; (C) al resolver que la falta de dos frenos independientes en su vehículo constituyó negligencia *per se;* (D) al conceder $13,951.00 por servicios de enfermeras especiales y (E) al no resolver que el demandante actuó negligentemente al situarse de espaldas al tránsito y al automóvil del demandado.

Las partes han presentado alegatos muy bien elaborados e interesantes en defensa de sus respectivas posiciones en este recurso. Después de un detenido estudio de los mismos, de las alegaciones, de la bastante extensa prueba oral y documental presentada por ambas y de las determinaciones de hecho y de derecho claras y precisas hechas por el Tribu-

nal Sentenciador concluimos que ninguno de los errores indicados fue cometido y, que, desde luego, la sentencia debe confirmarse.

Las conclusiones de hecho formuladas, con excepción de la número 23 que se refiere al seguro contra accidentes que mantenía el codemandado Ramírez de Arellano, determinaron lo siguiente:

"DETERMINACIONES DE HECHOS

"1—El día 7 mayo de 1960, entre nueve y diez de la mañana, el Sr. José María Jarabo conducía su automóvil marca Opel, Modelo 1960, por la Avenida Ponce de León de esta Ciudad en dirección de Este hacia Oeste, o sea, de Río Piedras hacia San Juan. Cuando se aproximaba a un semáforo en los alrededores de la Parada 26, frente al Colegio del Sagrado Corazón, el Sr. Jarabo detuvo su vehículo, por estar roja la luz del semáforo, en el carril que quedaba a la derecha, e inmediatamente contiguo, al centro de la avenida. En dicha fecha el tránsito por la avenida Ponce de León discurría en ambas direcciones.

"2—A la vez el demandado Dr. Max Ramírez de Arellano conducía su carro Rambler American, Modelo 1958, inmediatamente detrás y en la misma dirección del vehículo del demandante, e igualmente se detuvo detrás de dicho vehículo en atención a la luz roja del semáforo.

"3—Cuando la luz del semáforo cambió de roja a verde, bien fuere debido a que el carro del demandante al reanudar su marcha se deslizó un poco' hacia atrás, o bien fuera porque el automóvil del demandado comenzó a moverse hacia adelante antes de tiempo (el demandado no sabe cuál de estas alternativas realmente ocurrió), el Rambler American chocó levemente con su parachoque delantero contra el parachoque trasero del Opel. Con motivo de este golpe entre los vehículos, el Sr. Jarabo detuvo una vez más su carro y se bajó para ver que daños había sufrido. El Dr. Ramírez de Arellano también detuvo su carro, y entre ambas partes mediaron breves palabras, conviniendo entonces alinearse bien a la derecha de la avenida para examinar el carro del demandante sin interrumpir el tránsito.

"4—El demandante en efecto llevó su automóvil hacia la derecha, lo alineó bien y se desmontó, yendo a pararse detrás de

su carro, de espaldas a Río Piedras, y poniéndose allí a examinar la parte posterior de su vehículo.

"5—Desde donde ocurrió al primer impacto ya descrito hasta el sitio donde estaba parado el demandante detrás de su carro ya alineado había una distancia de alrededor de 96 pies.

"6—El demandado también procedió a llevar su carro desde el centro de la calle hacia la extrema derecha, tal como se convino. A tal fin se movió a una velocidad de alrededor de 15 millas por hora, y cuando ya estaba en línea recta detrás del carro estacionado del demandante, separado de éste unos 30 pies, intentó aplicar su freno de pie pero el pedal se hundió hasta el piso sin efecto alguno. El demandado no llegó a poner el pie sobre el pedal del freno de emergencia. Admitió que después de darse cuenta que el freno de pie no funcionaba no desvió su marcha hacia la derecha ni hacia la izquierda, ni intentó montar el vehículo sobre la acera que estaba entonces a sólo un pie de distancia de sus ruedas derechas, ni usó el sistema de cambios para poner el carro en primera o en 'riversa', ni hizo otra cosa que no fuera oprimir varias veces el mismo pedal para ver si con ello creaba presión en el sistema hidráulico de frenos.

"7—No hubo prueba de que el demandado tocase klaxon o bocina, o de que diera aviso otro alguno al demandante mientras el carro del demandado avanzaba en línea recta directamente hacia el demandante que estaba parado de espaldas examinando su propio vehículo.

"8—Como resultado de los hechos antes expuestos, el automóvil del demandado fue a chocar con su parte delantera contra la parte trasera del vehículo del demandante, atrapando a éste entre parachoque y parachoque. Cayó al pavimento el demandante con ambas piernas fracturadas en varios sitios y con el dedo índice de su mano derecha completamente cercenado. De inmediato fue atendido por el doctor demandado y enviado luego en ambulancia al hospital municipal de donde fue trasladado ese mismo día, también en ambulancia, al Auxilio Mutuo en Hato Rey.

"9—Después del accidente pudo sentirse un fuerte olor a líquido de frenos, así como un copioso escape de dicho líquido del interior de la rueda derecha trasera del automóvil del demandado. El policía probó allí mismo los frenos de pie y constató que el pedal se iba hasta el piso y que no funcionaban los frenos.

"10—El automóvil Rambler American había sido comprado nuevo por el demandado en agosto de 1958. En diciembre 2 de 1959 fue llevado al Garage Gómez en Hato Rey para arreglarle el eje trasero y un retenedor que se le había roto. Se le cambió el eje trasero por uno nuevo, se le puso un nuevo retenedor y una caja de bolas, y se le cambiaron los 'chupones' y las bandas de los frenos en todas sus ruedas. Desde esa fecha hasta el día del accidente de este caso los frenos habían funcionado bien. Durante los cinco meses y cinco días que transcurrieron desde diciembre 2 de 1959 hasta mayo 7 de 1960 no se hizo ninguna inspección o reparación del sistema de frenos de este vehículo.

"11—Dichos frenos funcionaron bien el mismo día del accidente, temprano por la mañana, hasta que, a 30 pies antes del choque fatal, el demandado oprimió el pedal para detenerse detrás del carro del demandante. En este punto fue que por primera vez el demandado se dio plena cuenta de que no funcionaba el freno de pie.

"12—El automóvil del demandado no estaba provisto de dos frenos independientes el uno del otro, ni suficientes cada uno por sí solo para detener la marcha del vehículo dentro de una distancia adecuada y prudente. El llamado freno de emergencia en este vehículo no era suficiente para detener, por sí solo, la marcha normal del carro en el sentido de que si el freno de pie dejaba de funcionar, también cesaba de funcionar el de emergencia. En realidad, el freno de 'emergencia' no era tal, sino únicamente un freno de estacionamiento ('a parking brake').

"13—La causa de que fallase el freno hidráulico de pie en este caso en particular fue que el 'chupón' de la rueda trasera derecha tenía una pequeña grieta o rajadura por donde se salió el líquido del sistema de frenos y, como consecuencia de ello, al oprimirse el pedal no se producía presión hidráulica alguna. Dicha pequeña grieta o rajadura fue a su vez producida paulatina y gradualmente por picaduras o caries que habían en el cilindro de metal situado debajo del 'chupón'. Tales picaduras o caries del metal también se fueron formando poco a poco, en un proceso lento de deterioro por el uso.

"14—Después del accidente, el cilindro así picado o con caries, y el 'chupón' agrietado, fueron cambiados por cilindro y 'chupón' nuevos en el Garage Gómez.

"15—Al ser atrapado entre los parachoques de ambos vehículos, el demandante sufrió lesiones graves. El dedo índice de su

mano derecha se desprendió y cayó al pavimento de la avenida. Fue luego amputado en el hospital por la falange próxima, y más tarde hubo necesidad de operarle por segunda vez para una completa desarticulación del dedo por la articulación metacarpal-falangina, removiéndosele entonces los restantes tendones de ese dedo. La falta del dedo impide al demandante utilizar a plenitud su mano derecha, a tal punto que casi no puede escribir, ni afeitarse, ni peinarse. Cada una de las piernas del demandante sufrió varias fracturas compuestas polifragmentarias y desplazadas en el tercio superior de la tibia y de la fíbula, que penetraron la superficie articular de las dos rodillas, con pérdida de tejido óseo tibial. Ambas extremidades fueron enyesadas durante varios meses, y en la pierna izquierda hubo pérdida considerable de tejido cutáneo debido a necrosis de la piel, quedando expuesto el hueso de la tibia. Hubo gran ulceración que requirió considerable injerto de piel ('skin grafting'). El demandante estuvo recluido en el hospital del Auxilio Mutuo, donde era socio, durante un año, tres meses y diez y siete días, desde mayo 7 de 1960 hasta septiembre 24 de 1961. Cuando salió de allí aún no podía caminar sin la ayuda de muletas y ha seguido siendo tratado y atendido en su hogar, hasta el presente, por su médico Dr. Manuel Espinosa, prestigioso ortopeda de esta Capital.

"16—Como resultado de las lesiones sufridas en este accidente, el demandante tiene una incapacidad general permanente de un 62%. El pronóstico es que las rodillas pueden mejorar pero nunca curar.

"17—La condición física del demandante después del accidente fue tan seria que hubo necesidad de proveerle enfermeras especiales veinticuatro horas al día durante muchos meses. Desde el punto de vista estrictamente médico, dichas enfermeras especiales día y noche eran indispensables durante los tres primeros meses de reclusión y durante el resto del tiempo era necesaria una enfermera especial diaria. No obstante, la prueba demostró que desde el punto de vista legal de la razonabilidad de los daños reclamados, lo gastado por el demandante en enfermeras especiales durante toda su reclusión hospitalaria es ciertamente razonable y legítimo. Su condición constante de inhabilidad total requería tales enfermeras constantemente.

"18—Los demandantes desembolsaron real y efectivamente las siguientes cantidades de dinero como consecuencia del accidente y de las resultantes lesiones físicas:

716

"(a)  Enfermeras especiales ................................$ 13,951.00
(b)  Laboratorio Arreche (Sangre) ....................    240.00
(c)  Drogas y medicinas .........................................    151.51
(d)  Pagado al Auxilio Mutuo (Curas de emer-
       gencia, aire acondicionado en el cuarto, y
       cama extra a veces para la Sra. Jarabo
       durante las primeras semanas ................  1,414.75
(e)  Gastos de transportación ...........................    105.00
                                                                         ―――――――――
       Total ..............................................$ 15,862.26

"19—El valor razonable de los servicios especiales extraordi-
narios prestados al demandante por el Dr. Manuel Espinosa,
por sobre los servicios regulares que normalmente se prestan en
estos casos, es de $2,000.00, suma ésta que consideramos en ex-
tremo razonable toda vez que dicho galeno practicó varias opera-
ciones de importancia al paciente, lo visitó alrededor de 450 veces,
de día y de noche, en días festivos, y obviamente sus servicios
fueron realmente beneficiosos para el demandante.

"20—La reparación de las averías causadas en el choque al
automóvil del demandante costó la suma de $108.26.

"21—La habitación que ocupó el demandante en el Auxilio
Mutuo durante sus 505 días de reclusión tiene un costo normal
de $20.00 por día, sin aire acondicionado, para cualquier paciente
que no sea socio de la institución. El demandante lo era. El aire
acondicionado costaba $2.00 diarios en adición al costo de la
habitación. Siendo un cuarto caluroso, el aire acondicionado era
prácticamente una necesidad para mantener confortable al
paciente.

"22—La esposa del demandante experimentó extraordinarias
angustias, sustos, preocupaciones, dolores y sufrimientos con
motivo de las lesiones de su marido, de la prolongada reclusión
en el hospital y de las varias operaciones quirúrgicas, de los
considerables gastos habidos, y de la crítica condición de su
esposo durante el tratamiento, así como por motivo de la actual
permanente incapacidad general y de la mano derecha mutilada.
En mayor grado tuvo el esposo demandante sufrimientos físicos
y angustias mentales, preocupaciones, desvelos, aprensión, etc.,
y obviamente habrá de tenerlos durante el resto de su vida, dada
su incapacidad permanente."

Podemos afirmar que el recurrente, en su alegato,— págs. 2–5—sustancialmente, y a veces tal como se exponen, acepta la corrección de las anteriores determinaciones. Sobre los hechos esenciales, tal como en ellas figuran, no existe aquí controversia alguna.

A–B. Estos dos apuntamientos se discuten conjuntamente. A la luz de las circunstancias concurrentes, reveladas por la evidencia creída por el Tribunal a quo, la doctrina de súbita emergencia no tiene aplicación. Acertadas consideramos las conclusiones de derecho 3 y 4 sobre este punto y que dicen:

"3—El demandado Dr. Max Ramírez de Arellano incurrió en negligencia o descuido que fue la causa próxima y única del accidente aquí envuelto. Aún en el supuesto de que no tuviese motivos para anticipar que en el preciso momento en que oprimió el pedal del freno de pie (al acercarse al carro del demandante ya alineado), dicho freno de pie le fallaría inesperadamente, resulta claro que por inatención, descuido o negligencia dejó de tomar una cualquiera de las precauciones corrientes y ordinarias que pudo haber tomado para evitar arrollar al demandante. Pudo y debió haber usado su freno de emergencia, o haber puesto el carro en 'riversa' o en primera, lo que hubiese detenido prontamente la escasa velocidad que llevaba y así hubiese evitado atrapar a un ser humano a quien estaba viendo al frente, totalmente desprevenido e inconsciente del peligro que se le acercaba. Ciertamente debió, al menos, haber dado algún aviso con su klaxon o bocina o de cualquier otra manera, aun gritándole, para que el demandante pudiese haber salido de la zona de peligro con solo dar uno o dos pasos hacia el lado. Pudo y debió el demandado, una vez que se dio cuenta de que su freno de pie no funcionaba, desviarse o hacer rozar su rueda delantera derecha contra el encintado de la acera, que le quedaba tan solo a un pie de distancia, de dicha rueda, y con tal obstáculo se hubiese detenido el vehículo prontamente. Al no tomar ninguna de estas medidas de precaución, el demandado incurrió en omisión culpable y negligente.

"4—La doctrina de súbita emergencia no es aplicable en este caso, ya que el demandado no adoptó *ninguna* precaución después del fallo de sus frenos de pie. Dicha doctrina se refiere

a aquellos casos en que el conductor *ha actuado en alguna forma,* aunque sin éxito, no pudiendo considerársele negligente por no haber actuado *en cualquier otra forma,* que quizá hubiese tenido éxito. Además, en el caso presente la 'súbita emergencia' fue creada por el propio demandado ya que surgió del hecho aquí probado al efecto de que su vehículo no estaba provisto de un verdadero freno de emergencia como lo exige la Ley. De haberlo tenido y usado, ciertamente se hubiese detenido el automóvil normalmente, sin que se desarrollase súbita emergencia."

Véase *Banchs* v. *Colón,* 89 D.P.R. 481 (1963).

C. La violación efectiva del Art. 12 de la Ley de Tránsito, por el demandado recurrente al conducir un automóvil por la vía pública sin dos frenos independientes, cada uno de los cuales sería suficiente, por sí solo, para detener la marcha del automóvil dentro de una distancia adecuada, quedó demostrada por las declaraciones de los mecánicos Muñoz y Parsons, testigos del propio demandado recurrente, quienes demostraron que el freno de emergencia que tenía el Rambler del recurrente no era suficiente para pararlo a distancia razonable. Según dijo el primero ". . . el vehículo se va deteniendo gradualmente pero no lo para a una distancia razonable, solamente ayuda sobre las dos ruedas de atrás" (T.E. pág. 114, Tr. Acabá). El segundo declaró, entre otras cosas, que el Rambler del 1958 "En las ruedas traseras el freno actúa por un freno que se llama 'parking brake' " o sea freno de estacionamiento. Es obvio que para aquella época esos vehículos tenían un sistema de frenos inadecuado e insuficiente que no respondía al exigido por la ley vigente entonces. Asumiendo que lo hubiera tenido, la prueba demostró que no se mantenían en buenas condiciones, y sobre todo, que en el momento crítico el recurrente no hizo uso de los mismos. Es para el caso en que uno de esos frenos falle, que la ley exige el otro.

■ Aunque no constituyere, negligencia *per se* el incumplimiento del estatuto, la falta de tomar alguna de las precauciones que indica en sus conclusiones el Tribunal senten-

ciador constituyó conducta negligente que le hizo responsable de los daños y perjuicios que motivó.

Aunque los hechos envueltos en el caso de *Acha* v. *Cintrón*, resuelto Per Curiam el 16 de junio de 1950, difieren en algunos aspectos de los ocurridos en el presente recurso, consideramos apropiado citar del mismo los siguientes párrafos:

"En el presente caso, en ausencia de prueba que excuse la aparente culpa o negligencia de la conductora del automóvil, nos parece claro que sería de aplicación la doctrina de *res ipsa loquitur* invocada por el apelado, pues un automóvil conducido con el debido cuidado o circunspección, no debe subir a una acera. La explicación que del accidente hace la conductora del vehículo no satisfizo al juez de la corte inferior. Suponiendo que el freno de pie fallara súbitamente al tratar de aplicarlo frente a la Iglesia Santa Ana, esa circunstancia, por sí sola, no excusaría el accidente, pues en previsión de contingencias de esa índole la Ley, como hemos visto, exige que cada automóvil esté dotado, por lo menos, de dos frenos independientes, cada uno de los cuales deberá ser suficiente por sí solo para detener la marcha del vehículo, dentro de una distancia razonable; y si uno de ellos fallare, el otro pueda reemplazarlo durante la emergencia.

"En la hipótesis de que el freno de pie fallara inesperadamente, como alega la conductora del vehículo, no ha explicado por qué el freno de emergencia, que es mecánico y que ninguna relación guarda con el de pie, se dañara también súbitamente y al mismo tiempo que el otro.

"A nuestro juicio estuvo justificado el juez al concluir que el vehículo no tenía los frenos en la forma requerida por la Ley de Automóviles y que ésa fue la causa próxima del accidente. Tratando de excusar su negligencia por el mal estado de los frenos, la conductora del automóvil declaró que un mes antes del accidente, el vehículo fue examinado por un mecánico—quien declaró al mismo efecto—y que los frenos se hallaban entonces en buen estado. Suponiendo que esto justificara el accidente, la corte no dio crédito a esa prueba, que el demandante no pudo controvertir con evidencia directa, por ser algo que se hallaba dentro del conocimiento exclusivo de la conductora y su testigo; pero no cabe duda que los hechos físicos hacen dudar, por lo menos, de la veracidad de esa prueba."

D. El recurrido Jarabo ingresó en el Hospital Auxilio Mutuo, gravemente herido, el 7 de mayo de 1960 y salió el 27 de setiembre de 1961. Allí estuvo recluido, sufriendo varias operaciones, unos 16 meses consecutivos. Después ha sido atendido médicamente en su hogar. El médico principal que lo atendió le hizo unas 450 visitas mientras estuvo recluido allí. Fueron necesarios, dado su estado de salud, los servicios de enfermeras especiales. Lo invertido en esos servicios fue satisfecho completamente por Jarabo. La razonabilidad de su costo resulta obvia. De su existencia y detalles los demandados fueron oportunamente notificados, aunque es cierto que en la demanda la partida por ese concepto, ascendente a $13,951.00, no se especifica.

E. Bajo las circunstancias del caso, carece de méritos el apuntado error de no haber resuelto el tribunal a quo que el demandante actuó negligentemente al situarse de espaldas al tránsito y al automóvil del demandado. Más bien es una circunstancia que exigía del demandado mayor cuidado, circunspección y prudencia. Todas las oportunidades de evitar el accidente las tuvo a su alcance.

*Se confirmará la sentencia apelada.*