CRISTÓBAL RODRÍGUEZ GONZÁLEZ ET AL., demandantes y recurridos, *v.* PONCE CEMENT CORPORATION ET AL., demandadas y recurrentes.

*Número:* R-67-208　　　*Resuelto:* 30 de diciembre de 1969

202

*Héctor Martínez Muñoz,* abogado de los recurrentes; *César Andreu Ribas* y *Luis A. Lugo, Jr.,* abogados de los recurridos.

EL JUEZ ASOCIADO SEÑOR BLANCO LUGO emitió la opinión del Tribunal.

Una noche oscura, lluviosa, y de neblina, hace poco más de siete años, ocurrió un lamentable accidente en la carretera estatal núm. 152 que de Barranquitas conduce a Comerío. La colisión de un camión de arrastre de la Ponce Cement Corporation con un automóvil de turismo conducido por el demandante recurrido ha dejado como saldo un profesional permanentemente incapacitado, que lleva una existencia anodina y desesperada. Para la reparación de los perjuicios causados se incoó la correspondiente acción. No se presentaron testigos presenciales de los hechos. El demandante, mentalmente incapacitado, está impedido de ofrecer su versión de los hechos; la parte demandada no ofreció el testimonio del conductor del camión.[1] Pero éste no es un obstáculo insalvable, según veremos.

Dependiendo exclusivamente del testimonio de un testigo que llegó al lugar del choque poco después de ocurrido y que describió en detalle la posición en que quedaron los vehículos y de los hechos observados durante una inspección ocular efectuada, el tribunal de instancia, mediante inferencias fundadas, determinó que la única y exclusiva causa del accidente fue la negligencia del conductor del camión. Dictó sentencia favorable a la parte actora por la suma total de $176,014.83 e incluyó un pronunciamiento de $10,000 para honorarios de abogado. Acordamos revisar.

1. Amparándose en la ausencia de testigos oculares, la recurrente tesoneramente insiste en que no se estableció

---

[1] A la conclusión de la presentación de la prueba de la parte demandante, la demandada recurrente anunció que no ofrecería prueba en cuanto a la ocurrencia del accidente. Había anunciado como testigo al conductor del camión Cándido Coímbre Rivera.

Nos llama la atención que, ante la incapacidad del demandante para declarar, no se tomara la deposición del conductor del camión. Tampoco se presentaron en evidencia fotografías del lugar de los hechos ni de los vehículos envueltos en la colisión.

cumplidamente, mediante prueba adecuada, que las actuaciones generadoras de responsabilidad sean atribuibles indefectiblemente al conductor del camión. Precisa, por tanto, hacer una relación de los hechos pertinentes que el tribunal estimó establecidos y las inferencias que de ellos derivó.

La colisión ocurrió en un tramo comprendido entre el kilómetro 3.9 y el kilómetro 4 de la carretera mencionada, recto y llano, en el cual en condiciones normales hay completa visibilidad. Mas esa noche, la visibilidad había disminuido por la lluvia que caía y la neblina que envolvía la región. Los vehículos se dirigían en direcciones opuestas: el del demandante, en marcha descendente, de Barranquitas a Naranjito; el camión de la demandada, en marcha ascendente, de Naranjito a Barranquitas. Además,

". . . los carros que vienen de dicho pueblo [Naranjito] a Barranquitas no se advierten hasta que no suben al tope de la pendiente en el mismo punto que marca el K. 4 [en este caso, el camión]. Asimismo los carros que discurren de Barranquitas hacia Naranjito [el del demandante] se le pierden de vista a cualquier persona . . . cuando pasan del K. 4 porque empiezan a descender la pendiente.

En el tramo de carretera comprendido entre el K. 4 y K. 3.9 donde ocurrió el accidente y a mano izquierda de Naranjito hacia Barranquitas [dirección del camión] hay un paseo de barro colorado que tiene de ancho . . . más o menos siete pies y un risco de ocho a diez pies de profundidad.

A mano izquierda en esa misma dirección el paseo está cubierto de vegetación y yerba verde más o menos del mismo ancho pero que remata en un talud que tiene una altura de dos pies sobre el nivel de la carretera."

El ancho del rodaje de la carretera, de alrededor de dieciocho pies, no permite la ocupación por más de dos vehículos que discurran en direcciones opuestas.

La posición de los vehículos después del accidente conforme al testimonio de Ángel Santos se describió así: el del demandante, en la dirección que llevaba, de Barranquitas

a Naranjito, "a su derecha bien afuera de la carretera; las gomas de la izquierda no tocaban ni un pie de la brea y el resto del automóvil estaba en la parte fangosa del área de rodaje"; el camión estaba en su derecha en forma sesgada.(²)

El lado izquierdo del vehículo del demandante estaba destrozado; los daños comenzaban en la parte izquierda de la parrilla y se extendían hasta el tapalodo, la puerta izquierda estaba hundida, abolladuras que llegaban hasta la cerradura misma; el guía, partido y doblado; el foco izquierdo delantero, apagado, mas no así el derecho; la goma izquierda delantera, doblada y metida hacia el vehículo. El camión no presentaba avería alguna ni en la cabina ni en la plataforma.

Con este cuadro de hechos, en un notable esfuerzo por reconstruir lo que realmente ocurrió, el juez a quo los interpretó, y mediante el razonamiento que se expone, expresó:

"La prueba demostró que el trailer caminaba en dirección contraria al vehículo del demandante; que la noche era lluviosa y neblinosa; que el conductor del vehículo de la demandada venía ascendiendo; que la carretera estaba fangosa; que había un risco de ocho a diez pies a la derecha del conductor del vehículo de la demandada; que este vehículo es un trailer o camión grande, pesado. El área de rodaje no permite nada más que dos vehículos discurrir en direcciones contrarias. El carro del demandante es un carro de turismo extremadamente más liviano que el de la demandada. Está discurriendo por un tramo completamente llano. Al recibir el impacto sufre daños principalmente en toda su parte lateral izquierda apareciendo la puerta hundida y el guía doblado. Tras el impacto queda detenido a su extrema derecha, sus gomas izquierdas, delantera y trasera, solamente ocupan un pie del área de rodaje, el resto del vehículo

---

(²) Cuando un agente del orden público fue al lugar a investigar el accidente ya el camión de arrastre estaba correctamente alineado a su derecha. El conductor Coímbre había permanecido en el sitio mientras el testigo Santos conducía al demandante a Barranquitas para proporcionarle primera ayuda.

queda en el paseo de tierra. El trailer, por el contrario, está sesgado en la carretera. Conforme establecemos en las conclusiones de hecho, además de la poca visibilidad debido a la neblina el conductor del trailer no tenía visibilidad hacia adelante hasta que no subiera al tope de la pendiente que venía ascendiendo en su ruta hacia Barranquitas y que remataba en el mismo Kilómetro 4 de dicha carretera.

Es lógico inferir que el camión, un vehículo extremadamente pesado y largo, venía por el centro de la carretera ya que era lo más seguro dadas las condiciones de precaria visibilidad y de carretera mojada que existía. Permiten estos hechos inferir, además, que cuando el truck llegó al tope de la cuesta y entró al tramo comprendido entre el Kilómetro 4 y el Kilómetro 3.9 se enfrentó de súbito al vehículo del demandante cuya derecha el camión le estaba ocupando por lo menos en la mitad que le correspondía a aquél. En ese momento el señor Coímbre trató de hacer una maniobra sesgando el camión hacia su derecha para evitar el impacto sin lograrlo. Nos impresiona el hecho de que el camión de la demandada no presentara daños en su parte frontal. Es lógico inferir que los daños causados al vehículo del demandante no lo fueron con la parte frontal del camión o trailer porque esto fue evitado por la maniobra hecha por el conductor al sesgar el camión. Más bien podemos deducir que los daños se causaron con la plataforma del camión y ésta conforme revela la prueba era una plataforma de hierro. La posición en que quedó el vehículo del demandante descarta, a nuestro juicio, la posibilidad de hacer una inferencia o deducción de que el accidente pudo haberse debido a un patinazo de dicho vehículo. Un patinazo más bien lo hubiera lanzado contra el camión en vez de lanzarlo en la posición en que quedó, a su extrema derecha y casi totalmente sobre el paseo de la carretera."

Es ésta la apreciación que se impugna. La posición de la recurrente intenta llegar al mismo resultado a través de tres vertientes: (i) la impropiedad de fijar la responsabilidad en ausencia de evidencia sobre la forma en que ocurrió el accidente, (ii) el recurrir a lo que denomina la especulación y la conjetura, y (iii) la existencia de otras posi-

bilidades causales compatibles con el cuadro de hechos reseñado.

■ De inmediato precisa advertir que aunque la carga de la prueba correspondía a la parte actora no se le exigía aquel grado que excluyendo la posibilidad de error, produjera una certeza absoluta. Explicada satisfactoriamente la falta de evidencia directa—por la ausencia de testigos presenciales desinteresados y la incompetencia del demandante como consecuencia del accidente mismo—podía descargarse esta responsabilidad mediante la presentación de prueba indirecta, en este caso, inferencias. Todo cuanto se le requería era la presentación de prueba a cuya luz una persona razonable pudiese quedar convencida de que el acto generador de la responsabilidad era atribuible a la parte demandada. *Murcelo* v. *H. I. Hettinger & Co.*, 92 D.P.R. 411, 426–427 (1965), expone la norma aplicable en las siguientes palabras:

"Sabemos que la parte que sostiene la afirmativa en la cuestión deberá presentar la evidencia para probarla.—Arts. 1168, Código Civil y 108 y 162, párr. 5, Ley de Evidencia. Pero, por regla general, la ley no exige aquel grado de prueba que, excluyendo la posibilidad de error, produzca absoluta certeza; porque tal prueba—asegura la propia ley—es rara vez posible. Sólo se exige la certeza moral, o un grado de prueba que produzca convicción en un ánimo no prevenido. No se tiene que probar el caso con exactitud matemática mediante evidencia directa, ni de modo concluyente, ni que produzca un grado tan perefecto de convicción que no admita la posibilidad de la prueba en contrario. El litigante puede probar su caso con evidencia indirecta, que es de dos clases, inferencias y presunciones. Es inferencia, la deducción que de los hechos probados, o acreditados completamente, hace en su discernimiento el juzgador. A veces se denomina presunción *hominis*. Representa ese discernimiento una actividad humana valorativa de comparación o confrontación, un proceso interno que constituye, a juicio del profesor Serra Domínguez, algo inabordable; el movimiento de la razón yacente en el hombre.

En este tipo de acción la parte demandante luego de haber presentado evidencia a cuya luz una persona razonable pueda quedar convencida de que el acto dañoso se debe a la culpa u omisión de la demandada no está obligada a eliminar o excluir toda otra posible causa del suceso del cual se deriva la responsabilidad exigida. Aun en el campo penal, cuando El Pueblo sólo ofrece evidencia circunstancial de culpabilidad, ya no tiene que ser ésta inconsistente con cualquier hipótesis razonable de inocencia. *Pueblo* v. *Bonilla,* 78 D.P.R. 152 (1955)."

■ Precisamente a cumplir con esta norma se dirigió la prueba de la parte demandante. Estableció las características físicas del lugar de los hechos, la descripción y dirección en que viajaban los vehículos, la forma en que quedaron después de la colisión y los daños por éstos sufridos. Estos hechos permitían discernir racional y lógicamente la forma en que ocurrió el accidente. Correspondía al juzgador hacer las conclusiones que tal prueba permitía sin que fuera absolutamente indispensable que se produjeran testigos oculares.

■ Tampoco el hecho de que el accidente pudiera obedecer a otras causas es suficiente por sí solo para derrotar la reclamación. Sólo era necesario que el tribunal estimara que la acción u omisión indicada por el actor fue la que con mayores probabilidades causó el accidente. *Cf. Sáez* v. *Municipio de Ponce,* 84 D.P.R. 535 (1962). A este respecto la parte demandada arguye que el accidente pudo haber ocurrido por un patinazo del vehículo del demandante que obligó a éste a abandonar su trayectoria. Pero juiciosamente, el juez a quo descarta esta posibilidad diciendo: "Un patinazo más bien lo hubiera lanzado contra el camión en vez de lanzarlo en la posición en que quedó, a su extrema derecha y casi totalmente sobre el paseo de la carretera."

No se nos ha convencido de que debamos alterar las determinaciones del juez a quo, quien además estaba en mejor posición para hacer las inferencias por haber efectuado personalmente una inspección ocular del lugar del accidente.

2. Mientras prestaba testimonio el señor José Colón Santini, Juez de Paz de Barranquitas que había investigado el accidente a los fines de fijar la responsabilidad criminal por el mismo, declaró que seis días después de ocurrido el choque,

"El señor Coímbre Rivera [el conductor del camión] venía acompañado también de un señor que dijo llamarse Norberto Colón quien me informó que venía en representación de la Ponce Cement y que ellos asumirían toda la responsabilidad . . . ."

Acto seguido el abogado de la parte demandada solicitó la eliminación de lo transcrito fundándose en que se intentaba variar la causa de pedir a una obligación de origen contractual mientras que la demanda se había entablado bajo el supuesto de la responsabilidad aquiliana o extracontractual que emana de los Arts. 1802 y 1803 del Código Civil, 31 L.P.R.A. secs. 5141 y 5142. Para ello se invocó *Ramírez Ortiz* v. *Gautier Benítez*, 87 D.P.R. 497 (1963). En la exposición del reparo sobre la admisibilidad se aludió además a la ausencia de prueba previa sobre las facultades que tenía el señor Colón para obligar a la demandada Ponce Cement Corporation mediante admisiones, citándose *Castro* v. *Hettinger & Co.*, 79 D.P.R. 884 (1957). A su vez, la parte proponente de la prueba arguyó que podía recibirse propiamente por tratarse de manifestaciones hechas en presencia del conductor del vehículo, y como tales, admisiones por silencio. En ese instante el juez a quo indicó que era admisible para los fines indicados, "ahora, no en este momento porque todavía no se ha establecido aquí quién es Norberto Colón ni en qué capacidad iba allí", mas no para variar la base de la reclamación.

El testigo añadió, sin que se objetara por las demandadas:

". . . cuando el señor Norberto Colón me manifestó que la Ponce Cement asumiría la responsabilidad entonces el señor Rodríguez González me dijo que él no tenía interés en el caso

y que el litigaría con la compañía de seguro; que entonces como se acostumbra en estos casos cuando las partes se ponen de acuerdo pues determiné el caso como uno de un accidente casual.

.    .    .    .    .    .    .    .

El [Norberto Colón] se me presentó como un representante de la Ponce Cement.

.    .    .    .    .    .    .    .

. . . dijo yo vengo en representación de la compañía . . . ."

Al intentar presentarse en evidencia una llamada certificación expedida por el juez de paz a requerimiento del demandante Rodríguez, (³) se reprodujo la objeción sobre la variación de las alegaciones. El tribunal la sostuvo y se negó a admitirla por ese fundamento, y además porque no se había establecido que el señor Colón estuviera autorizado por la compañía aseguradora para hacer aceptación alguna.

En el contrainterrogatorio, a preguntas para que explicara su determinación judicial al disponer de la investiga-

---

(³) "CERTIFICO:

"Que con fecha 20 de noviembre de 1962 realicé la vista de investigación en relación a un accidente automovilístico ocurrido en la carretera 152 del Bo. Quebradillas de Barranquitas entre el vehículo (Trailer) conducido por Cándido Coímbre Rivera y el vehículo conducido por Cristóbal Rodríguez González. Hechos ocurridos el 14 de noviembre de 1962.

"Que en dicha vista estuvo acompañado el conductor Coímbre Rivera por el Sr. Norberto Colón, quien informó que su presencia se debía a ser representante de los dueños del vehículo que conducía el conductor Coímbre Rivera.

"Que ante la alegación del Sr. Norberto Colón, quien se comprometió con el perjudicado Sr. Rodríguez González a que su compañía de seguros se haría cargo de todos los daños y demás gastos que pudiera sufrir el perjudicado, éste manifestó su intención de litigar el caso por la vía civil con la compañía de seguros y que por tanto no tenía interés en el caso, por todo lo cual determiné el accidente como uno casual, ante la promesa del Sr. Norberto Colón que el perjudicado sería indemnizado de todos los daños.

"Barranquitas, Puerto Rico, a 12 de marzo de 1963.

"(Fdo.) José Colón Santini
        Juez de Paz."

ción de que se trataba de un accidente casual "por las circunstancias en que ocurrieron", (⁴) dijo:

"Me refería a la proposición que le hizo el señor Norberto al manifestar que su, el señor Norberto Colón, de que su compañía arreglaría todo, se haría cargo a los daños y que como la parte perjudicada aceptaba eso con ellos, el litigaría con la compañía."

Reiteró que no se refería a los hechos del caso en sí, sino a la disposición del demandante de reclamar civilmente.

Nuevamente, varios días después, a la conclusión de su prueba, la parte demandante intentó ofrecer en evidencia la "certificación" del juez de paz. El tribunal ratificó su criterio y no la recibió como prueba.

En sus conclusiones de derecho el juez de instancia señaló:

"Hay evidencia *adicional* de que un funcionario de la Ponce Cement Corporation, identificado como tal, hizo manifestaciones ante el Juez de Paz en presencia del codemandante, del policía investigador y del propio conductor Coímbre Rivera, a quien dicho funcionario fue acompañando, en el sentido de que dicha empresa asumía la responsabilidad de los daños sufridos por el señor Rodríguez. Esas manifestaciones ocurren seis días después del accidente. Podemos presumir que la codemandada Ponce Cement Corporation había investigado el mismo. Es después de oídas las manifestaciones expresadas por el funcionario de la Ponce Cement que el demandante expresa al juez no tener interés en el asunto porque lo resolvería civilmente y el juez entonces declara el mismo casual. Ésa es la norma usual y corriente. Entendemos que esa conducta establece una admisión de responsabilidad de parte de la codemandada. Es preciso señalar que tanto Coímbre Rivera como Colón Garay, el fun-

---

(⁴) "Caso casual. Se trata de un accidente entre el vehículo que conducía el acusado (Trailer) y el del perjudicado, pero oída la declaración del perjudicado, éste dice que llevará la reclamación de los daños directamente a la Compañía de Seguros y que por tanto no tiene interés en el caso. Se determina el accidente como uno de naturaleza casual por las circunstancias en que ocurrieron."

cionario de Ponce Cement que hizo las manifestaciones antes referidas, estaba en Corte."

La parte demandada solicitó la reconsideración de la sentencia y adujo, entre otros fundamentos, que las anteriores determinaciones no estaban sostenidas por la evidencia toda vez que el tribunal durante el juicio había sostenido su objeción a la admisión "a dicha prueba", refiriéndose al testimonio oral del Juez Colón Santini. Indicó que contaba con evidencia para impugnar a dicho magistrado consistente precisamente en la llamada certificación expedida por éste que la parte actora había infructuosamente tratado de introducir como prueba. (5) La moción de reconsideración fue declarada sin lugar sin hacer expresa referencia a este planteamiento.

Con relación a todo este incidente las recurrentes apuntan que el tribunal de instancia incidió: (a) al tomar en consideración después de concluido el juicio evidencia objetada y excluida, privándola así de su derecho a contrainterrogar y a demostrar que el referido empleado (i) no hizo las manifestaciones que se le atribuyen, (ii) no tenía autorización para hacer tales manifestaciones ni admisiones a nombre de la Ponce Cement Corporation y la compañía aseguradora; y, (b) el no hacer referencia en la resolución de la moción de reconsideración a la prueba documental admitida durante la vista de dicha moción de la cual surge que el juez de paz había hecho manifestaciones inconsistentes a las adoptadas por el tribunal en sus determinaciones.

---

(5) Señálase que son contradictorias la afirmación en el juicio al efecto de que ". . . ellos, la Ponce Cement Corporation, asumían toda la responsabilidad" y lo expresado en la certificación que "Norberto Colón se comprometió con el Sr. Rodríguez a que su compañía de seguros se haría cargo de todos los daños y demás gastos que pudiera sufrir."

Apuntamos que tanto la Ponce Cement Corporation como la aseguradora United States Fire Insurance Company fueron incluidas como demandadas.

De la reseña que hemos hecho del incidente al margen de la declaración del Juez Colón Santini aparece que la atestación sobre las manifestaciones vertidas por el empleado Norberto Colón fueron excluidas únicamente en tanto en cuanto podían tener el efecto de variar la causa de pedir, de la fundada en negligencia que sustenta las alegaciones a una de origen contractual. *Cf. Grindell* v. *Cities Delivery Express*, 62 D.P.R. 133 (1943). Por igual motivo se rechazó la "certificación" expedida por dicho magistrado a solicitud del demandante Rodríguez. No habiendo el tribunal fundado su sentencia en la responsabilidad *ex contractu* que concebiblemente pudiera surgir de la actuación del empleado Colón, es insostenible en este particular la impugnación de la parte recurrente.

█ Ahora bien, tal parece que las manifestaciones de Colón fueron admitidas en un principio para el propósito señalado por uno de los abogados de la parte demandante: establecer una admisión por silencio del conductor del camión—que dicho sea de paso, no fue incluido como demandado—pero no como una admisión directa de responsabilidad de parte de la empresa propietaria o su aseguradora. De ahí que el tribunal al emitir su resolución dijera, "Entiende el Tribunal que la evidencia así para ese único propósito sería admisible; ahora, no en este momento porque todavía no se ha establecido aquí quién es Norberto Colón ni en qué capacidad iba allí." Luego, el mismo testigo, sin que se hiciera reparo alguno, identificó a Colón como un representante de la Ponce Cement Corporation, según sus propias afirmaciones, ". . . yo vengo en representación de la compañía." Puede entenderse, por tanto, que se estableció que Colón era agente de la empresa demandada, pero no hay prueba alguna que sostenga que la supuesta admisión de responsabilidad que puede desprenderse de sus manifestaciones estaba comprendida dentro de los límites de la agencia, esto es, que Colón tuviese autoridad para hacerla.

Así se requiere, inciso 5 del Art. 35 de la Ley de Evidencia, 32 L.P.R.A. sec. 1678; *Castro* v. *Hettinger & Co.*, 79 D.P.R. 884 (1957); *Calderón* v. *Cacho*, 62 D.P.R. 620 (1943); Jones, *Law of Evidence* (ed. 1958), vol. 2, § 355. McCormick, *On Evidence*, § 244, pág. 519; Conrad, *Modern Trial Evidence*, vol. 1, § 509; Schreiber, *Trial Evidence in Civil Cases* (ed. 1969), párrs. 20–3 y 21–12. *Portilla* v. *Carreras de Schira*, 95 D.P.R. 804 (1968) y *Guzmán López* v. *Ortiz*, 39 D.P.R. 184 (1929), no son de aplicación por tratarse en ellos de admisiones directas de responsabilidad hechas por el principal y no a través de un agente. En este sentido erró el tribunal a quo al resolver que las manifestaciones de Norberto Colón traídas a través del testimonio del Juez Colón Santini establecieron una admisión de responsabilidad de parte de la codemandada.

Sin embargo, este error no tiene el efecto de requerir la revocación de la sentencia. Como aparece claramente de las determinaciones del juez a quo su fundamento principal para declarar incurso en la negligencia exclusiva al conductor del camión surge de las inferencias que hizo de la prueba presentada. Específicamente se refirió a la llamada admisión de responsabilidad como "evidencia *adicional*". La sentencia se sostiene plenamente sin necesidad de alusión alguna a la admisión, y, en consecuencia, debe prevalecer.

3. Finalmente la recurrente señala que el tribunal a quo incidió (a) al concluir que existe relación causal entre el accidente y las lesiones sufridas por el demandante, (b) al fijar los daños causados en la suma de $176,014.83, y, (c) al imponerle el pago de la suma de $10,000 por concepto de honorarios de abogado.

(a) Al omitir elevar la transcripción de los testimonios de los peritos médicos, la recurrente no nos ha puesto en condiciones de evaluar este apuntamiento.[6] Las determi-

---

[6] La propia recurrente reconoció la necesidad de la transcripción de evidencia para sostener la comisión de este error. Solicitó se le permi-

naciones minuciosas que hizo el tribunal a quo sobre el particular(⁷) nos impresionan como un ejercicio cuidadoso de su función de aquilatar la prueba. Surge que la causa más probable de las lesiones es de origen traumático, y no la hipertensión a que se refirió el perito de la recurrente.

tiera acompañarla a los fines de nuestra consideración para la expedición del auto de revisión, a lo que accedimos. Posteriormente indicó que la procedencia del recurso podía dilucidarse independientemente del error sobre la causalidad de las lesiones. Expedimos el auto. Conforme a la Regla 54.2 de las de Procedimiento Civil, la recurrente no hizo ante el tribunal de instancia designación de prueba oral a ser transcrita. Las únicas piezas de transcripción de evidencia oral se elevaron por gestión de la parte recurrida para la discusión del incidente sobre la admisión de las manifestaciones hechas ante el Juez de Paz Colón Santini por Norberto Colón.

(⁷)"17. . . . Después de ser atendido en el Hospital Municipal pasó la noche en la residencia del señor Graciani en Barranquitas, quien lo condujo al otro día a su casa en Villa Caparra.

"18. Al ser recibido allí por su esposa se quejaba de mucho dolor de cabeza. Tenía un golpe en una pierna y una contusión en la nariz y estaba muy nervioso. Sin embargo, se cambió de ropa y el señor Graciani lo llevó a la oficina a llevar la nómina y a informar el accidente. Regresó antes del almuerzo y se acostó porque se sentía mal y permaneció acostado durante todo ese fin de semana.

"No se llamó ningún médico para que lo atendiera. Aparentemente restablecido el señor Rodríguez se reintegró a su trabajo y trabajó durante todo el mes de noviembre y diciembre, pero durante este tiempo era afectado por dolores de cabeza y con una condición aparentemente catarral la cual se manifestaba por el drenaje de una sustancia líquida por sus fosas nasales que él atribuía a pituita causada por catarro nasal común. Antes del 24 de diciembre salió para Tejas y regresó el día 7 de enero. Se quejó al llegar de haber sufrido mucho dolor de cabeza. El dolor de cabeza le persistió durante todo el tiempo antes de que su condición hiciera crisis y él lo aliviaba tomando aspirinas. En esas condiciones siguió trabajando hasta el 1ro. de abril de 1963.

"19. En esta fecha él salió para Barranquitas en gestiones de su trabajo. Al otro día 2 de abril llamaron a su esposa en casa de Graciani indicándole que su esposo estaba enfermo. Su esposa se hizo acompañar del Doctor Arrillaga, su hermano, y fue a buscarlo.

"Cuando llegaron el señor Rodríguez no los reconoció, estaba en una condición grave, hablaba en forma incoherente. En esos momentos no tenía fiebre, pero su temperatura comenzó a subir a las 4:00 de la tarde de ese día.

"20. Se llamó al Dr. Rifkinson y éste ordenó su hospitalización a las once de la noche. La condición del paciente era grave, el diagnóstico

(b) Los distintos elementos de daños considerados al fijar la compensación total de $176,014.83, son los siguientes: sufrimientos físicos y morales del demandante Cristóbal Rodríguez González, $75,000; sufrimientos y angustias mentales de su esposa Concepción Arrillaga, $25,000; gastos

---

era de meningitis. Estuvo recluido en el hospital desdé el 2 hasta el 20 de abril del mismo año cuando fue dado de alta. Siguió bajo tratamiento en su casa y se le hicieron varias pruebas neurológicas descubriéndose que tenía una masa extraña en el lóbulo temporal izquierdo. Reingresó en el hospital el día 9 de mayo de 1963 y fue sometido a una operación intracraneal como resultado de la cual le extrajeron una [sic] hematoma intracerebral del lóbulo temporal izquierdo del cerebro. Fue dado de alta el 18 de mayo de ese mismo año.

"21. Durante todo el episodio de la meningitis y la operación intracerebral y hasta el momento del juicio el señor Rodríguez fue atendido y tratado por el Neurocirujano Dr. Nathan Rifkinson, quien declaró en el juicio en su carácter de perito en esa rama de la medicina y como médico de cabecera del demandante.

"El Doctor Rifkinson declaró extensamente sobre el origen de la meningitis sufrida por el señor Rodríguez así como de la [sic] hematoma que le fuera descubierta en el cerebro. Declaró también sobre la causa de ambas afecciones.

"A juicio del Tribunal la declaración del Dr. Nathan Rifkinson estableció concluyentemente que tanto la meningitis como la [sic] hematoma fueron consecuencia derivada del golpe sufrido por el demandante sobre la frente el día del accidente.

"22. Quedó establecido en forma concluyente además que al recibir el impacto sobre esa región el señor Rodríguez sufrió una fractura en la placa cribosa que desgarró la dura produciendo el drenaje acuoso que estuvo sufriendo durante todo el tiempo después del accidente y hasta el día 1ro. de abril. Esta condición fue responsable de que se introdujeran bacterias dentro de las cubiertas del cerebro produciendo inflamación infecciosa de las cubiertas del cerebro que es lo que comúnmente se conoce como meningitis.

"En relación con la meningitis declaró el doctor Rifkinson que pruebas médicas concluyentes hechas durante el tratamiento al señor Rodríguez habían demostrado la ausencia de causas tales como infecciones sanguíneas, infecciones causadas por heridas penetrantes, o infecciones de otra índole en distintas partes del cuerpo y que resultaba significativo el historial de síntomas que mostraba el señor Rodríguez, tales como golpe en la cabeza, contusión en la nariz, hemorragia de 'sanguaza' por las fosas nasales, dolores de cabeza recurrentes, 'catarro', rinitis o 'pituita', recurrente y el uso del antibiótico.

"Explicó que todo este cuadro indicaba que al momento del accidente el señor Rodríguez sufrió la fractura de la placa cribifórmica, que es una plancha ósea que se encuentra en la base frontal del cerebro, detrás

médicos realmente incurridos, $10,610.13; y "pérdida por concepto de ingresos que dejara de percibir el demandante por razón de los daños sufridos y que le han incapacitado permanentemente para el trabajo" $65,404.70.

El lucro cesante, reconocido como un elemento de daños que debe considerarse al fijar el resarcimiento, se

de la nariz. Fracturas de esta placa pueden ser ocasionadas por golpes recibidos en cualquier parte de la cabeza, pero principalmente en los recibidos en el área de los lóbulos temporales, o sea, el lado izquierdo frontal o derecho frontal de la cabeza o por golpes encima de la nariz. Generalmente esto produce unas hendiduras muy finas en dicha placa por la cual se escapa líquido cerebro-espinal que entonces sale por las fosas nasales y si como resultado del golpe se sangra por la nariz, entonces la mezcla del líquido cerebro-espinal con la sangre da la impresión de una 'sanguaza'.

"El líquido cerebro-espinal no fluye continuamente sino que su flujo es detenido por pequeñas adherencias que temporal o permanentemente cubren las hendiduras, pero si la persona estornuda o si sopla la nariz las adherencias se despegan y permiten el gotereo del líquido cerebro-espinal que da entonces la impresión de 'catarro' o rinitis. Por estas hendiduras se pueden colar gérmenes que producen infecciones en las meninges y el doctor Rifkinson mencionó haber tratado casos de meningitis recurrente en que la causa de la recurrencia era la existencia de hendiduras como las antes mencionadas.

"En la opinión del doctor Rifkinson la meningitis del señor Rodríguez se debió a gérmenes que habían llegado a las meninges por vía de las hendiduras ocasionadas por el golpe recibido en el accidente del 14 de noviembre de 1962.

"23. En cuanto a la [sic] hematoma cerebral el Tribunal entiende que la prueba pericial estableció en forma concluyente que la misma fue la consecuencia del golpe o trauma recibido por el señor Rodríguez en la frente.

"En relación con esta condición el doctor Rifkinson declaró que se había investigado mediante pruebas médicas las principales causas del mismo y por eliminación la causa más probable resultaba ser la del trauma en la cabeza. Dijo el doctor Rifkinson que positivamente el resultado de pruebas hechas al paciente había descartado causas tales como la rotura de alguna aneurisma intracraneal, ruptura de vasos sanguíneos con paredes debilitadas por condiciones tales como arterioesclerosis o por cualquier otra razón o como resultado de una condición de hipertensión. Señaló que la causa más común de hematomas intracerebrales lo era trauma a la cabeza y que habiendo sido eliminadas la existencia de las otras causas, en su opinión el hematoma intracerebral sufrido por el señor Rodríguez había sido causado por los golpes recibidos en el accidente del 14 de noviembre de 1962 y que el historial de síntomas evidenciado por

compone propiamente de la pérdida de ingresos ocasionada al perjudicado y la disminución de su capacidad productiva. Corresponde al demandante establecer la pérdida de ingresos hasta la fecha de la vista de la causa, generalmente

---

el señor Rodríguez durante el período de tiempo desde el accidente hasta su hospitalización así se lo confirmaba. Informó que estas lesiones comienzan con una pequeña hemorragia de algún vaso sanguíneo intracerebral como resultado del trauma a la cabeza y producen una condición latente de una masa que lentamente crece dentro del cerebro hasta que se liquifica algún tiempo después, variando este tiempo de persona a persona y que en el caso del señor Rodríguez, resultó ser alrededor de cuatro meses, lo cual es razonable.

"En la opinión del doctor Rifkinson el señor Rodríguez ha quedado permanentemente incapacitado de sus funciones intelectuales sin probabilidades de que su condición mejore en el futuro debido a que el tejido cerebral no regenera y las áreas afectadas quedan así permanentemente. Informó además que la vista de su paciente también había quedado permanentemente afectada y sobre este aspecto había sido referido al doctor Andrés Montalvo, quien lo había examinado y tratado en cuanto a esa condición. Dijo que la incapacidad en las facultades intelectuales en su paciente era un grado tal que éste no podría nunca volver a ejercer su profesión de ingeniero ni ninguna otra que requiriera el uso de razonamiento y que tampoco podía ocupar posición alguna de responsabilidad. Añadió que el señor Rodríguez estaría expuesto toda su vida a ataques epilépticos y tendría que tomar medicinas anticonvulsivas. El dio órdenes de que el señor Rodríguez no compareciera ante el Tribunal debido a que su paciente estaba incapacitado y desconocía su verdadera situación y vivía esperanzado de que algún día sería curado por completo. Señaló además que su paciente padecía de una condición de afasia que le afectaba el habla. Indicó que en octubre de 1963 había referido su paciente a un psicólogo en relación con el problema del habla.

"La prueba presentada por la demandada no logró desvirtuar la declaración del doctor Rifkinson. Su único testigo el perito doctor James Arnold, Jr., un neurocirujano de Baltimore, estado de Maryland, declaró después de oír el testimonio y la relación del doctor Rifkinson y admitió que nunca había visto ni había examinado al señor Rodríguez y que su declaración sobre el caso estaba basada en un examen de los récords médicos del paciente, así como en la declaración emitida por el doctor Rifkinson. Básicamente la opinión del doctor Arnold concuerda con la opinión del doctor Rifkinson, excepto que contrario al doctor Rifkinson el doctor Arnold manifestó que la causa más común de hematomas intracerebrales lo era hemorragias espontáneas de los vasos sanguíneos en el cerebro. Sin embargo, reconoció que en una conocida obra médica sobre la materia titulada 'Injuries of the Brain and Spinal Cord and Their Coverings' se señalaba el trauma a la cabeza como la causa más común de hematoma intracerebrales."

mediante la sencilla prueba de la reducción en los mismos atribuible a causas originadas por el accidente; la disminución en la capacidad productiva requiere una proyección futura del efecto de los daños. No hay regla fija para estimar el importe de la disminución en la capacidad productiva; cuando menos se requieren tres determinaciones básicas: (a) la extensión de la mengua en la capacidad productiva, que ordinariamente se establece mediante una comparación de la habilidad para obtener ingresos antes y después del accidente; (b) la determinación de los efectos de la disminución, si transitoria o permanente; y (c) la fijación de la suma que compensa por esta disminución, considerando tanto su extensión como sus efectos, incluyendo la actualización de la pérdida (*present net worth*). No es necesario que la prueba demuestre con precisión matemática los daños causados por este concepto; basta con que se ofrezca una base razonable que permita hacer una determinación prudente, y no hija de la especulación y la conjetura. Anotación, *Sufficiency of Evidence, in Personal Injury Action, to Prove Impairment of Earning Capacity and to Warrant Instructions to Jury thereon*, 18 A.L.R.3d 88; 16 Am. Jur., *Proofs of Facts*, pág. 701 *et seq.*, 22 Am. Jur.2d, *Damages*, § 89-101. [8]

■ Aunque específicamente la parte recurrente no impugna la cuantía de $65,404.70 concedida por la disminución de la capacidad productiva, estamos satisfechos de que la misma no es irrazonable ni caprichosa y que se determinó con los escasos elementos de prueba que se presentaron. Si algún reparo tiene es que de los ingresos anuales del

---

[8] Generalmente se han utilizado las tablas de mortalidad para determinar la extensión del período de incapacidad. No obstante, es más confiable la expectativa de vida productiva (*work life expectancy*). La dificultad estriba en que la única tabla que a tales efectos se ha utilizado, denominada Smith-Griffin, es de valor limitado por haber considerado para su formulación únicamente empleados de ferrocarriles. Véase, *Work Life Expectancy*, 26 Ins. Counsel J. 190 (1959).

demandante se redujo una cantidad representativa de la contribución de ingresos que presumiblemente le correspondería satisfacer. La mayoría de la doctrina americana rechaza esta deducción en las acciones por lesiones personales, Anotación, *Propriety of taking income tax into consideration in fixing damages in personal injury or death action*, 63 A.L.R.2d 1398, § 4[a]; *Income Tax as a Factor in Measuring Personal Injury Awards*, 8 Ark. L. Rev. 174 (1954); 16 NACCA L.J. 212 (1955). Véase, Sec. 22(b)(5) de la Ley de Contribución sobre Ingresos, 13 L.P.R.A. sec. 3022(b)(5).

En cuanto se refiere al importe concedido por sufrimientos físicos y angustias mentales, atendidas todas las circunstancias concurrentes, estimamos que es razonable la suma de $60,000 para el demandante Cristóbal Rodríguez González y $15,000 para su esposa Concepción Arrillaga; *cf. Vda. de Fornaris v. Amer. Surety Co. of N.Y.*, 93 D.P.R. 29 (1966); *Jarabo v. Ramírez de Arellano*, 93 D.P.R. 709 (1966); *Vda. de Seraballs v. Abella Hernández*, 90 D.P.R. 368 (1964).

Igualmente se reducirá a $5,000 la condena en honorarios de abogado.

*Así modificada, se confirmará la sentencia dictada por el Tribunal Superior, Sala de Bayamón, en 6 de abril de 1967.*

El Juez Asociado Señor Rigau confirmaría la sentencia en su totalidad y el Juez Asociado Señor Ramírez Bages confirmaría el pronunciamiento del tribunal de instancia sobre la compensación a doña Concepción Arrillaga de Rodríguez. El Juez Presidente Señor Negrón Fernández y los Jueces Asociados Señores Hernández Matos y Torres Rigual no intervinieron.