NANCY DÍAZ VDA. DE BÁEZ Y OTROS, demandantes-recurridos, *v.* ESTADO LIBRE ASOCIADO DE PUERTO RICO Y OTROS, demandado-recurrente el primero.

*Número:* R-84-322      *Resuelto:* 6 de marzo de 1987

*Roberto Schmidt Monge, Procurador General, Américo Serra, Procurador General Auxiliar,* abogados del recurrente; *José Antonio Pagán Nieves,* abogado de los recurridos.

### SENTENCIA

Evaluados los planteamientos y argumentos de las partes contenidos en los alegatos que radicaron —a la luz de un análisis de la exposición narrativa de la prueba y la evidencia documental admitida en evidencia a nivel de instancia— se

modifica la sentencia dictada por el Tribunal Superior, Sala de Caguas (Caso Civil Núm. CS-81-1371), en cuanto a imponer responsabilidad total al Estado Libre Asociado de Puerto Rico por el accidente a que se contrae la demanda radicada. A esos efectos, se modifica —por criterio mayoritario de los señores jueces que comparten la anteriormente descrita posición— la referida sentencia concluyéndose y determinándose que el occiso Ángel P. Báez Báez fue negligente en un setenta (70%) por ciento y el Estado Libre Asociado en un treinta (30%) por ciento.

Al computar las cuantías finales, el tribunal de instancia deberá tomar en consideración y aplicar las deducciones que sean procedentes conforme la Sec. 8 de la Ley de Protección Social por Accidentes de Automóviles (Ley Núm. 138 de 26 de junio de 1968, según enmendada, 9 L.P.R.A. sec. 2058), y la doctrina establecida en *Zeno Molina* v. *Vázquez Rosario*, 106 D.P.R. 324 (1977), y *Canales Velázquez* v. *Rosario Quiles*, 107 D.P.R. 757 (1978).

Así modificada, se confirma.

Lo pronunció y manda el Tribunal y certifica el señor Secretario General. El Juez Asociado Señor Negrón García emitió opinión concurrente a la cual se unen los Jueces Asociados Señores Hernández Denton y Alonso Alonso. El Juez Asociado Señor Rebollo López emitió opinión concurrente y disidente. El Juez Asociado Señor Ortiz concurre con la sentencia en cuanto a la imposición de responsabilidad al Estado Libre Asociado de Puerto Rico, siendo del criterio que éste fue el único negligente. El Juez Asociado Señor Hernández Denton emitió voto particular. La Juez Asociada Señora Naveira de Rodón emitió opinión disidente a la cual se une el Juez Presidente Señor Pons Núñez.

(*Fdo.*) Bruno Cortés Trigo
*Secretario General*

—O—

Opinión concurrente del Juez Asociado Señor Negrón García a la cual se unen los Jueces Asociados Señores Hernández Denton y Alonso Alonso.

"Un pensador no especializado en temas jurídicos, Eugenio d'Ors, afirma que cada sentencia justa que en el mundo ha sido, contiene el símbolo viviente de la justicia." C. Rodríguez Aguilera, *La Sentencia*, Barcelona, Ed. Bosch, 1974, pág. 94.

En el drama humano que sirve de trasfondo a este recurso, la sentencia de 7 de junio de 1984, del Tribunal Superior, Sala de Caguas —imponiéndole responsabilidad total al Estado Libre Asociado por el trágico accidente en que murió ahogado Ángel P. Báez Báez, al caer su automóvil en aguas del Lago Carraízo— debe modificarse por imperativo evidenciario fáctico y la aplicación de la doctrina de negligencia comparada. [1]

I

El 30 de enero de 1981 Báez Báez —residente de Juncos— conducía su vehículo de motor Toyota, modelo 1977, tablilla 42X207. Le proveyó transportación a Julio Calderón hasta la Cafetería Río Cañas en Caguas. De ahí, al atardecer, partió por la Carr. Estatal Núm. 796, inmediata al Lago Carraízo. Durante la travesía desapareció. El 1ro de febrero su ausencia fue notificada a la Policía.

Dos días después, su cadáver fue encontrado dentro del auto que estaba hundido en las aguas del lago. Ambos fueron recuperados. La autopsia no mostró indicios de violencia o traumas. Su muerte fue calificada de asfixia por inmersión.

---

[1] La defensa afirmativa Núm. 3 de la contestación a la demanda enmendada, expone que la "culpa o negligencia [de Báez Báez] . . . contribuyó a la ocurrencia del [accidente]". *Exhibit IV*, pág. 8. En la súplica de la revisión se nos pide la revocación de la sentencia, o "en la alternativa [que se] reduzca sustancialmente el porcentaje de responsabilidad impuesto al Estado por el Tribunal sentenciador".

La Carr. Núm. 796 es rural bidireccional. Comienza en el Km. 3.9 de la Carr. Estatal PR-798, tramo paralelo a la Carr. Estatal PR-1. El último inventario rural realizado por la Oficina de Planificación del Departamento de Transportación y Obras Públicas fue el 6 de noviembre de 1975 (revisado el 28 de agosto de 1976).

El tramo de esta vía en cuyas aguas adyacentes se encontró el auto accidentado (Km. 4, Hm. 1), tiene una superficie asfáltica que varía 3.10 metros (diez pies, dos pulgadas) a 3.40 metros (once pies, dos pulgadas). Varios metros antes del sitio exacto de la caída, la carretera tiene una semicurva moderada. Después el tramo es recto. Paralelo al lado donde cayó, existe un paseo de grama y vegetación de aproximadamente seis (6) pies de ancho cuyo terreno termina abruptamente. Después de este declive, abajo están las aguas de las márgenes del lago. El paseo tiene algunos desniveles sustanciales. El examen de las fotografías tomadas por la Policía el día en que se rescató el cadáver de Báez Báez refleja que cuando la vegetación del paseo no está recortada, para un conductor no familiarizado es sumamente difícil, unos metros antes, apreciar cabalmente lo limitado de su tamaño. En la práctica esto significa que el paseo es poco utilizable y peligroso.

El ancho de la superficie de rodaje, aunque estrecho, permite cómodamente discurrir un solo vehículo. No así de converger dos vehículos en direcciones contrarias. En esa eventualidad y dependiendo de sus tamaños, uno de los conductores tiene que ceder el paso, desviarse y transitar por el paseo. A largo plazo, ello contribuye a crear en la orilla una situación de fango y desnivel. Estas condiciones aumentan la probabilidad de que un conductor —dependiendo de la velocidad que lleve— al verse obligado a salirse del área embreada de rodaje, penetre demasiado en el paseo, pierda el control y se precipite en las aguas del Lago Carraízo.

El drenaje de la carretera es pobre debido a que la vegetación adyacente es de nivel un poco más alto. Impide que el agua pluvial drene rápida y eficientemente hacia los lados. Esto propicia charcos en algunos puntos. Una carretera mojada genera el fenómeno conocido como *hydroplaning* [2] en el cual, las llantas de un vehículo tienden a disminuir la fricción y contacto físico con el pavimento, y por ende, dificulta el control de un vehículo, en particular si es necesario detenerlo rápidamente.

En el lugar exacto donde apareció el vehículo de Báez Báez existen cuerpos de agua a ambos lados de la carretera. No hay vallas o barreras de seguridad. Las guías del Manual de Ingeniería y Transportación, publicado por el Instituto de Ingenieros de Tránsito del Departamento de Transportación y Obras Públicas, recomiendan tales barreras de seguridad —dotadas de reflexión— en aquellos sitios en que los vehículos que se aparten de la vía estén expuestos a peligros poco usuales.

El Lago Carraízo es bordeado en el sector "La Veinticinco". En el sector específico del accidente este cuerpo de agua se encuentra a cuatro y a seis pies de la carretera. La carretera carece de línea marcada de centro que separe el tránsito que discurra en ambas direcciones y de una línea de borde del pavimento. Las guías 3B-1 y 3B-6 no lo exigen.

Conforme las guías existentes, el ancho normal de un carril es de 3.65 metros (doce pies$^2$). Por excepción, se permiten anchos menores "donde prevalezcan velocidades de operación bajas". Por las características de esta carretera, el transitar requiere velocidad moderada.

---

[2] *Hydroplaning*: "Estar o salirse fuera de control al deslizarse sobre la superficie de una carretera mojada." (Traducción nuestra.) *The American Heritage Dictionary*, 2da ed., Boston, Ed. Houghton Mifflin Co., 1985, pág. 631.

Finalmente, en la carretera no existen rótulos o señales de lugares peligrosos específicos o que adviertan los riesgos peculiares antes descritos.

A base de esta prueba, el ilustrado tribunal sentenciador impuso responsabilidad exclusiva al Estado. Concluyó que el área donde ocurrió el accidente no cumplía con las guías y normas de diseño adoptadas ni con las exigencias mínimas de seguridad reglamentarias. A su juicio, el tramo era "uno extremadamente peligroso e inseguro para los conductores que por allí transitan".(3) Dictaminó y enfatizó que las barreras de seguridad hubiesen evitado que el automóvil de Báez Báez cayera a las aguas del Lago Carraízo y se ahogara.

## II

La sentencia implícitamente parece apuntalarse en la doctrina de *res ipsa loquitur*, al razonar que el Estado no aportó prueba y aceptó el informe sobre deficiencias del perito Allende. Concluyó que la causa próxima del accidente fue la ausencia "de protección suficiente para el viajero que imperaba en la carretera estatal 796". Por esa razón descartó la imposición de negligencia comparada. Ello constituye una interpretación absolutista del Art. 404 del Código Político, 3 L.P.R.A. sec. 422, que no podemos refrendar. Erró.

Primero, salvo circunstancias peculiares *no* presentes en el caso de autos, no es aplicable la doctrina de *res ipsa loqui-*

---

(3) Al efecto, con vista al informe del perito Ing. Ángel L. Allende —aceptado por el Estado— señaló las siguientes condiciones: carretera estrecha, inmediata a las aguas del Lago Carraízo en un lado y al otro un cuerpo de agua con profundidades mayores de las seis (6) pulgadas. Drenaje deficiente y empozamientos de agua. Paseos resbalosos en aquellos sitios donde existen. Pendientes y declives negativos, drásticos e inclinados al Lago Carraízo que toman la forma o configuración de una rampa, y propician que un vehículo pierda el control al salirse de la carretera y caiga como consecuencia de esta inclinación al lago. Ausencia total de medidas protectoras, tales como barreras de seguridad o rotulación preventiva. Falta de iluminación o material reflectivo para ver el sitio peligroso. Falta de marcado de pavimento y paseos estrechos.

*tur.* (⁴) Por el control que de ordinario ejerce el conductor de un vehículo, y la alta probabilidad de que un accidente se deba a su negligencia parcial o total, no cabe invocarla. II *Blashfield, Automobile Law & Practice* Sec. 418.1 (1977).

Y segundo, en *Morales Muñoz* v. *Castro*, 85 D.P.R. 288, 292 (1962) —seguido en *Publio Díaz* v. *E.L.A.*, 106 D.P.R. 854, 863 (1978)— resolvimos que el Art. 404 del Código Político se nutre de los elementos preceptuados en el Art. 1802 del Código Civil, 31 L.P.R.A. sec. 5141. Por ende, no excluye la posible aplicación de negligencia comparada. Tampoco en circunstancias apropiadas, imputar negligencia total al conductor y liberar al Estado de responsabilidad. El análisis depurado de los hechos será lo determinante.

La razón de este enfoque responde a sólidas consideraciones. El Art. 404 no convierte al Estado en un garantizador absoluto de la seguridad de las personas que utilizan las carreteras públicas. *Rivera* v. *Pueblo*, 76 D.P.R. 404, 407 (1954). No se le puede exigir que todas las vías de comunicación y aceras estén en perfectas condiciones. No responde por todo riesgo imaginable o desperfectos, sino por los razonablemente *predecibles* y *anticipables*. Estamos en un área en que se impone una dosis de lógica y sentido común. Sería imposible requerirle que las avenidas, carreteras, caminos y aceras del país, en todo momento, estén construidas cumpliendo a cabalidad los requisitos ideales que la ingeniería moderna y la experiencia aconsejan. Sobre este aspecto, advertimos que mu-

---

(⁴) Nuestra jurisprudencia ha reconocido cinco condiciones para que la misma pueda prevalecer: (1) el accidente no debe de ordinario acaecer a no ser por la negligencia de otra persona; (2) debe causarlo una agencia o instrumentalidad bajo el control exclusivo del demandado; (3) *no debe ocurrir* debido a acción voluntaria alguna del demandante; (4) el conocimiento de las causas del daño sufrido debe estar más accesible al demandado que al demandante, y (5) debe existir un deber legal del demandado hacia el demandante de ejercer cierto grado de cuidado en la conexión con la instrumentalidad en particular para prevenir la ocurrencia del daño. *Soc. de Gananciales, Etc.* v. *Presbyterian Hosp.*, 88 D.P.R. 391, 397–398 (1963).

chas de las especificaciones contenidas en las guías aprobadas no son mandatorias ni intentan establecer normas con fuerza de ley. (Véase Norma 1A-4, pág. 4.) Bastaría un solo viaje por las carreteras, calles y caminos de la isla para apreciar que un número sustancial presenta la mayoría de las condiciones apuntadas por el perito Allende y refrendadas por el foro de instancia como defectos negligentes. En particular, se destacan las carreteras en la ruralía y aquellas secundarias que por la topografía adyacente y configuraciones presentan riscos, declives y precipicios peligrosos. Estas condiciones, de por sí evidentes al conductor, forzosamente no requieren la creación de medidas de seguridad especiales.

Por otro lado, sabido es que manejar un vehículo de motor conlleva ciertos riesgos inherentes. Estos peligros potenciales están relacionados con las condiciones, permanentes o temporales, de las carreteras. Muchos son palpables a la simple vista del conductor, tales como curvas, poco ancho, falta o inadecuada iluminación, humedad, grietas o fisuras en la zona de rodaje, paseos estrechos, cuestas o pendientes, ausencia de vallas y otros. Un riesgo normal adicional es el asociado con el tránsito de otros conductores y vehículos de motor.

A estas realidades responde la regla dorada de "velocidad relativa" consagrada en la Ley de Tránsito. Recoge el principio elemental de que la *"velocidad de un vehículo deberá regularse* con el *debido cuidado,* teniendo en cuenta el *ancho, tránsito, uso y condiciones* de la vía pública. *Nadie deberá guiar a una velocidad mayor de la que le permita ejercer el debido dominio del vehículo y reducir la velocidad o parar cuando sea necesario para evitar un accidente.* De conformidad con los requisitos expresados anteriormente, toda persona deberá conducir a una *velocidad segura y adecuada* al acercarse y cruzar una intersección o cruce ferroviario, al acercarse a la cima de una pendiente, *al viajar por una carretera estrecha o sinuosa,* o *cuando existan peligros especiales* con respecto a peatones u otro tránsito por *razón del tiempo* o *las condi-*

*ciones de la vía pública".* (Énfasis suplido.) 9 L.P.R.A. sec. 341(a).

## III

No hay prueba directa ni circunstancial *coetánea* al accidente sobre qué realmente lo causó y las razones por las cuales Báez Báez abandonó la zona asfaltada de rodaje. La disponible más cercana es de cuatro (4) días después. Como en tantos casos, no es posible su reproducción fiel y exacta, sin el peligro de incurrir en cierto margen de error. Sin embargo, ello no es óbice para intentar descorrer el velo misterioso de este evento. La tarea exige ponderar cuidadosamente todos los datos y hechos conocidos *con posterioridad* para —mediante un examen meticuloso de la evidencia circunstancial y las inferencias razonables— lograr la meta de máxima aproximación a la verdad jurídica sin caer en el campo de la especulación.

En esta misión expondremos una síntesis de todos los indicadores claves imprescindibles para una justa decisión. A tono con la evidencia, habremos de integrar y complementar los hechos esenciales que surgen del informe pericial y las fotografías. Después de todo, en lo concerniente a apreciar la prueba documental, estamos en las mismas condiciones que el foro de instancia. *Torres Arzola* v. *Policía de P.R.*, 117 D.P.R. 204 (1986), y casos allí citados. Respecto a las fotografías —por su contemporaneidad— las tomadas al momento de rescatarse el vehículo tienen mayor valor probatorio. *Portalatín* v. *Mena*, 77 D.P.R. 544, 548 (1954). Gozan de especial garantía circunstancial de veracidad pues: (1) la precisión y claridad con que presentan a la vista las imágenes recogidas por el lente de la cámara es más elocuente que muchos testimonios verbales; (2) salvo cuando responden a una composición alterada y ficticia son enteramente objetivas y confiables, y (3) tienen la cualidad de perpetuar ciertos detalles de sub-

siguiente importancia que nadie notó al momento de inspeccionar el lugar. Expongámoslos.

Primero, de haber Báez Báez mantenido su automóvil dentro de la zona asfaltada de rodaje —que era recta— no hubiese ocurrido el accidente. Para precipitarse bruscamente al agua, se salió de dicha zona, y simultáneamente a cierto ángulo, realizó un viraje y transitó por el paseo de grama.

Segundo, en la maniobra, presumiblemente la llanta delantera derecha, o ambas, fueron las que inicialmente perdieron contacto con el terreno sólido del paseo de grama antes del vehículo caer al lago.

Tercero, las fotografías reflejan que el pequeño vehículo de Báez Báez —de tamaño subcompacto— cayó y se hundió en el lago con la carrocería invertida. Las cuatro llantas quedaron hacia arriba. Las delanteras no están rectas, sino parcialmente viradas, indicativo de que momentos antes efectuó un viraje. El techo y la cabina estaban inmersos en el agua en contacto con el fondo sólido del lago. Curiosamente la parte delantera del automóvil quedó hacia la carretera. La única explicación posible para que dicho vehículo quedara en esa posición, es que se volcó violenta y totalmente al caer.

Cuarto, para caer el automóvil de Báez Báez en las aguas del Lago Carraízo, instantes antes, tuvo necesariamente que estar en movimiento a cierta velocidad. No sabemos cuál. Al tomar en consideración elementos como las distancias recorridas, la violencia de la caída y la posición en que quedó el vehículo, razonablemente inferimos que discurría a una velocidad relativamente exagerada. Ciertamente, la misma no le permitió controlarlo y detenerlo. Por el contrario, iba a suficiente velocidad como para transitar desde la carretera varios metros antes de caer y finalmente hundirse en el agua. Báez Báez no pudo detenerlo gradualmente. ([5])

---

[5] No hay evidencia de huellas de freno marcadas en el pavimento de la carretera. Las fotografías no las revelan. De haber existido las mismas,

Quinto, en este tramo la carretera carece de iluminación. Más adelante la hay, en zona poblada. Presumimos que el accidente ocurrió en el umbral del atardecer o ya caída la noche. También que el automóvil de Báez Báez tenía, o debió tener, dos luces delanteras "capaces de alumbrar hacia el frente la carretera por un trecho de 500 pies . . .". 9 L.P.R.A. sec. 1272 (a) (1).([6])

Sexto, dicha vía es asfaltada, estrecha y susceptible de que se formen algunos charcos cuando llueve. Sobre este particular, no se demostró que el *día de los hechos* hubiese llovido o que la carretera estuviese mojada. El informe de la Policía consigna esta última condición el 3 de febrero de 1981, fecha en que se descubrió el vehículo. Por ende, ese dato no es criterio válido para afirmativamente concluir que al ocurrir el accidente, 30 de enero —cuatro (4) días antes del informe— existiera la condición de humedad.

En este sentido, no es determinante la característica de que en la carretera pudiera crearse temporalmente la condición de *hydroplaning* que reduce el grado de fricción física de las llantas en el pavimento. Ante una lluvia copiosa y abundante el fenómeno es inevitable. El conocimiento y riesgo que ello crea es atribuible a todo conductor. Exige medidas adecuadas de precaución. Requiere mayor cuidado. En este caso

---

no es probable que pudieran detectarse cuatro (4) días después, en ocasión de descubrirse el automóvil. Esta laguna evidenciaria nos impide conjeturar al respecto.

Aclaramos, sin embargo, que su inexistencia no excluye nuestra conclusión sobre velocidad excesiva. Por el contrario, ello podría responder a que Báez Báez no frenó, no frenó súbitamente, o lo hizo gradualmente. Cualesquiera de estas hipótesis explicarían la ausencia de tales huellas. A su vez implicarían una conducta negligente por velocidad relativamente excesiva o por descontrol.

Finalmente, tampoco habrían huellas, de haberse deslizado el vehículo por la carretera estar mojada y efectos del *hydroplaning*.

([6])Muchas vías públicas, en especial en las zonas rurales del país no están iluminadas. Ello, por sí solo, no configura incumplimiento de un deber legal del Estado. Véase R. S. Kuhlman, *Killer Roads: From Crash to Verdict*, Virginia, The Michie Co., 1986, pág. 8.

no hay prueba de que lloviera así o que los charcos fueran de magnitud y extensión suficientes como para que forzosamente se manifestara el fenómeno de *hydroplaning*. Concluirlo constituye una especulación.

Séptimo, no se probó que Báez Báez manejara en estado de embriaguez. Por el avanzado grado de descomposición de su cuerpo, durante la autopsia no pudieron realizarse los análisis toxicológicos. Tampoco que fuera objeto de ataque criminal. Su vehículo no mostraba características físicas de haber sido impactado momentos antes del accidente.

Y octavo, el ancho del paseo de grama era limitado. La vegetación impedía a un conductor apreciar visiblemente esa situación. No había rótulos alertando este hecho. Tampoco vallas que impidieran a un automóvil en movimiento y descontrol desde la zona asfaltada de rodaje, caer al lago.

## IV

Aclarado estos extremos, pasemos a confrontar los indicadores antes relacionados y explorar las distintas alternativas que pudieron propiciar el accidente.

El mismo pudo ser producto de la exclusiva negligencia de Báez Báez, quien por su descuido —distracción, poca concentración, cansancio, velocidad inmoderada, etc.— perdió el control del automóvil, en un ángulo se salió peligrosa e innecesariamente de la zona asfaltada de rodaje, siguió por el paseo de grama y cayó al lago. Bajo esta hipótesis el Estado no sería responsable. El accidente se debió a que transitaba a una velocidad relativamente excesiva, en atención a las condiciones evidentes de peligrosidad y riesgos que presentaba la carretera.

Otra posibilidad es que Báez Báez, debido a lo angosto de la carretera, para evitar impactar otro vehículo que venía en dirección opuesta, se vio obligado a abandonar la superficie asfaltada de rodaje y acercarse peligrosamente al paseo de grama. En la maniobra sobrerreaccionó, y aunque logró evi-

tarlo, debido a la velocidad a que transitaba y a la fuerza del movimiento, cayó al lago. Otra hipótesis sería que fue cegado por las luces de otro vehículo y ofuscado perdió el control del automóvil. Ambas proposiciones serían congruentes con la ausencia de signos de una colisión vehicular previa.

También, el accidente pudo deberse a una decisión voluntaria y consciente de Báez Báez de salirse de la carretera para contemplar el paisaje, descansar, realizar una necesidad fisiológica, o cualesquiera otros motivos legítimos. Al hacerlo, calculó erróneamente el ancho del paseo y la velocidad que necesitaba para gradualmente detenerse, y desafortunadamente cayó al lago. Tampoco el Estado sería responsable.

Y finalmente, el accidente pudo causarlo una combinación de todos o algunos de los factores enumerados: vía estrecha, no iluminada, falta de avisos, *hydroplaning*, vehículo en dirección contraria, descuido del conductor, velocidad poco moderada, apreciación errónea del tamaño del paseo y su distancia, y la ausencia de vallas.

Todas estas alternativas presentan, como denominador común, que Báez Báez —por razones que no sabemos— perdió el control del automóvil, no pudo detenerlo, y moviéndose a velocidad indeterminada, pero suficientemente excesiva, se salió de la zona pavimentada de rodaje, siguió sobre el paseo de grama y violentamente cayó al lago. Ciertamente de no haber abandonado la carretera no se hubiese aproximado al paseo, y por ende, precipitádose al lago.

## V

En nuestro esfuerzo de fallar en estricta, pero humana juridicidad, al conjugar estas alternativas, nos inclinamos a refrendar la última. Concluimos que lo más probable es que el accidente se debió a la interacción de múltiples factores, unos atribuibles a las condiciones de la carretera y otros a la negligencia del conductor Báez Báez. " 'Raramente un accidente es el resultado de una sola causa. Usualmente varios fac-

tores influyentes afectan, en determinado momento, la situación. Estos factores influyentes pueden ser separados en tres grupos: el elemento humano; el elemento vehicular y el elemento de la carretera.' " (Traducción nuestra y escolio omitido.) R. S. Kuhlman, *Killer Roads: From Crash to Verdict*, Virginia, The Michie Co., 1986, pág. 140.

Réstanos adjudicar la proporción de negligencia. De ordinario la tarea es difícil. No puede ser perfecta. Aspira a lograr la mayor proximidad de verdad judicial. Muchas veces la precisión jurídica científica resulta imposible. Aquí, en particular, aunque sabemos que iba a una velocidad relativamente excesiva, la distribución es más compleja pues subsiste un enigma evidenciario: ¿por qué Báez Báez abandonó la carretera?

Sin embargo, esta laguna no es total. Hay prueba sobre la negligencia de ambas partes que permite inferir y concretar los hechos básicos. No hacerlo propiciaría un fracaso de la justicia. Hemos ponderado seguir el camino más fácil y atribuirle negligencia *por igual* a ambas partes. Así, aun cuando esta conclusión no respondiera a la verdad absoluta última —sólo conocida por el Sumo Hacedor— al menos poseería el ingrediente de ser matemáticamente *igual*. Por otro lado, aunque la igualdad es virtud medular de la JUSTICIA, su aplicación irrestricta puede ser injusta. Ante el dilema, rehusamos la aplicación de igualdad aritmética. "La versión etimológica general —Derecho, Diritto, Recht, Direito, Droit . . .— que significa, en suma, lo que no tiene curvaturas, ni flexión, inclinación, desdoblamiento, quebraduras, esto es, lo que es directo, lo recto, puede ser una fuente insuficiente. Bastante, acaso, para los geómetras jurídicos que piensan en las rectas seguras, pero inflexibles y monótonas. La recta, puede ser el camino de la verdad abstracta o ideal, pero la verdad humana, esa, como las vueltas del río, por las faldas de los montes, a lo largo de los valles, sigue todas las curvas necesarias y caprichosas del sentimiento." M. Iglesias Corral,

*El Enigma del Derecho*, en el Libro—Homenaje a Ramón Ma. Roca Sastre, Madrid, Gráficas Cóndor, 1976, T. I, págs. 63, 69.

Bajo este prisma, resolvemos que Báez Báez fue negligente en un setenta por ciento (70%) y el Estado en el remanente.

Esta distribución de negligencia responde al principio elemental antes aludido de que la velocidad de un vehículo deberá regularse con el debido cuidado, acorde con el ancho, tránsito, uso y condiciones, de una vía pública —en unión a la regla que la velocidad nunca será mayor a aquella que permita al conductor ejercer "el debido dominio del vehículo y reducir la velocidad o parar cuando sea necesario para evitar un accidente". 9 L.P.R.A. sec. 341(a)(1). Como principio rector, gobierna la solución del caso. Lógicamente existe una correlación entre la velocidad, los riesgos y la distribución de negligencia comparada. Mientras más son los peligros en una carretera, mayor el cuidado que debe ejercer el conductor. A su vez, ello aumenta el grado de negligencia. Báez Báez lo infringió e incurrió en negligencia activa al transitar a una velocidad relativamente excesiva. Véase *Vda. de Vila* v. *Guerra Mondragón*, 107 D.P.R. 418, 424 (1978). Adviértase, que muchas de las condiciones de peligro de la carretera eran evidentes (o debieron serlo) durante su último viaje.[7] A través de la Carr. Núm. 796, sin contratiempo, de día y de noche, han discurrido miles de vehículos en múltiples ocasiones bajo distintas condiciones climatológicas. Obviamente, de haberse mantenido prudencialmente dentro de los límites de velocidad que las condiciones de la carretera requerían, no hubiese ocurrido el accidente.

---

[7] "Las señales de precaución se usan cuando es necesario advertir a los conductores de condiciones de peligro, existentes o posibles, en o adyacentes a una calle o carretera. Las señales de precaución son de gran importancia para la prevención de accidentes. Su uso se debe mantener al mínimo, ya que su uso innecesario para advertir de condiciones que son aparentes tiende a causar desobediencia hacia todas las señales." Guía 2C-1 del Manual de Ingeniería y Transportación.

La negligencia de Báez Báez —si bien mayor por la prelación de que goza la regla de oro sobre "velocidad relativa" (acorde con los riesgos y condiciones peculiares de la carretera)— no exime de responsabilidad al Estado. Aunque antes no hubiera ocurrido un accidente igual, por lo angosto de la vía, la ausencia de paseo seguro y efectivo, y la presencia inmediata de dos cuerpos de agua, era razonablemente *predecible* que un automóvil tuviera que acercarse demasiado al paseo y cayera al lago. La negligencia del Estado, de carácter pasivo y de menor grado, consistió en haber omitido adoptar medidas para físicamente *evitar o reducir* ese riesgo —ampliando el paseo o erigiendo vallas de seguridad— o en su defecto, *advertir* expresamente la existencia de los mismos mediante la instalación de avisos y señales de precaución, (⁸) y así proveer tiempo suficiente al conductor para una reacción adecuada. Ante esta realidad, lo más razonable es concluir que la combinación de los factores mencionados motivaron el accidente. Aunque incompletos, todos los indicadores objetivos así lo revelan.

---

(⁸) Según las guías, las "señales se *deben* [aconsejable] *usar solamente* donde se requieran por las necesidades y estudios de campo y donde se apliquen reglamentaciones especiales en sitios específicos o a horas específicas solamente o donde los peligros no sean evidentes. Además, para proveer información sobre rutas, direcciones, destinos y puntos de interés. *Las señales no se necesitan para confirmar las reglas de la carretera*". (Énfasis suplido.) Guía 2A-1, *supra*, pág. 6.

La guía 2C-3 expone:

"Debido a que las *señales de precaución se instalan primordialmente para la protección del conductor que desconoce la carretera,* se debe tener cuidado de que su ubicación sea la correcta. En las áreas rurales, estas señales se instalan a unos 200 metros antes del peligro o condiciones peligrosas. En carreteras de alta velocidad, y especialmente en expresos, esta distancia puede ser de 450 metros o más. En áreas urbanas donde las velocidades son bajas, esta distancia se puede reducir a unos 75 metros.

"La distancia de advertencia se determinará, *realmente, por las condiciones existentes y la velocidad de la carretera.* Esto influye en el tiempo disponible al conductor para entender y reaccionar al mensaje y el tiempo que necesita para realizar las maniobras necesarias." (Énfasis suplido.)

Por los fundamentos expuestos, suscribimos la sentencia en que se modifica la del foro de instancia.

—O—

Opinión concurrente y disidente emitida por el Juez Asociado Señor Rebollo López.

Luego de reflexionar profundamente sobre si publicar o no como opinión disidente la posición que originalmente asumiéramos en el presente caso, hemos decidido hacerlo. A nuestro humilde entender, así no actuar representaría refrendar con nuestro silencio una actuación jurídicamente *ultra vires* por parte del Tribunal. Dicha actuación constituye un "precedente" extremadamente desafortunado. *La misma puede representar, para la práctica de la profesión en nuestra jurisdicción, la incertidumbre y la inestabilidad en la litigación civil.*

No debe existir duda en la mente de persona alguna de que un tribunal de justicia está plenamente autorizado para resolver un caso no sólo a base de la evidencia que las partes presenten durante el proceso que se celebre sino que en virtud de las inferencias *lógicas y razonables* que de dicha evidencia puedan y deban hacerse.

Ahora bien, el "problema" del cual adolece la opinión concurrente que se emite —la cual sirve de base a la sentencia mayoritaria del Tribunal— consiste en que en la misma se hacen una serie de inferencias, *sin apoyo alguno en la prueba*, las cuales se utilizan para decretar que la sentencia recurrida "debe modificarse por *imperativo evidenciario fáctico* y la aplicación de la doctrina de negligencia comparada", lográndose de esta manera, alegadamente, "la meta de *máxima aproximación a la verdad jurídica* sin caer en el campo de la especulación". (Énfasis suplido.) *Esto es, so color del poder inherente que tiene un tribunal para hacer inferencias, se decretan como hechos probados una serie de suposiciones y con-*

*jeturas que luego son utilizadas para determinar que el cau-
sante de los demandantes recurridos fue negligente, nada más
y nada menos, que en un setenta (70) por ciento.*

Al leer la opinión concurrente —y la sentencia— emitida,
no podemos evitar la impresión de que para que se pueda
haber concluido que existe en el caso "prueba sobre la negli-
gencia *de ambas* partes que permite inferir y concretar los
hechos" que se concluyen en la misma, los señores jueces que
suscriben dicha posición —en su genuino afán de hacer jus-
ticia mediante la consecución de "la meta de máxima aproxi-
mación a la verdad jurídica"— *inadvertida e inconsciente-
mente se han convertido, a nivel apelativo, en testigos peritos
y oculares de la demandada-recurrente Estado Libre Asociado
de Puerto Rico.*

Lo verdaderamente curioso de toda esta situación resulta
ser que ni aun a dicha parte demandada recurrente —repre-
sentada por la Oficina del Procurador General de Puerto
Rico— se le ocurrió, en el recurso de revisión que radicara,
*argumentar* sobre la alegada negligencia concurrente de parte
del occiso; ello obviamente debido a que dicho planteamiento,
dado los hechos particulares del presente caso, es totalmente
improcedente en derecho. Veamos.

## I

El 30 de enero de 1981 el Sr. Ángel Pablo Báez Báez, como
era su costumbre, salió de su trabajo a las 5:00 P.M. condu-
ciendo un automóvil de su propiedad por la Carr. Est. 796,
jurisdicción de Caguas, Puerto Rico, en dirección a su resi-
dencia. Le acompañaba un amigo de nombre Julio Calderón,
el cual abandonó el vehículo alrededor de las 5:30 P.M. en la
Cafetería Río Cañas localizada en la mencionada vía pública.
El señor Báez Báez continuó su marcha solo; no llegó a su ho-
gar esa tarde directo de su trabajo, como era su costumbre.
Los familiares de éste reportaron su desaparición a la Policía
de Puerto Rico el 1 de febrero de 1981. Dos días más tarde,

el cadáver del señor Báez Báez fue encontrado por personal de la fuerza policíaca dentro del vehículo de su propiedad, el cual se encontraba sumergido en las aguas del Lago Carraízo, jurisdicción del Barrio Bairoa de Caguas. Ordenada la correspondiente autopsia, la misma demostró que la muerte se debió a "asfixia por inmersión", no evidenciando el cuerpo del occiso signos de violencia ni de que hubiera hecho uso de bebidas embriagantes. ([1])

La viuda y un hijo menor de edad del señor Báez Báez radicaron demanda de daños y perjuicios contra el Municipio de Caguas([2]) y el Estado Libre Asociado de Puerto Rico ante el Tribunal Superior de Puerto Rico, Sala de Caguas. En dicha demanda se alegó, en síntesis y en lo pertinente, que la muerte del occiso se debió a la única y exclusiva negligencia del Estado Libre Asociado de Puerto Rico. Ello por razón de que la Carr. Est. 796 —la cual bordea el mencionado Lago Carraízo— se encontraba desprovista, a la fecha del accidente y en el tramo correspondiente, de las medidas de seguridad mínimas y necesarias. Se alegó, en adición, que la obligación legal de proveer éstas surge de las disposiciones del Art. 404 del Código Político de Puerto Rico, 3 L.P.R.A. sec. 422.

Surge de la "minuta" que resume los procedimientos ocurridos ante el foro de instancia el 29 de mayo de 1984 que las partes acordaron "someter el presente caso en base [sic] a las estipulaciones que someterán por escrito y otra prueba que obra unida al expediente".([3]) La parte demandante, aun

---

([1]) Surge del protocolo de autopsia que resultó imposible, dado el estado de descomposición del cadáver, realizar un examen toxicológico. El tribunal de instancia, sin embargo, le dio entero crédito al testimonio de la viuda del occiso a los efectos de que éste no hacía uso de bebidas alcohólicas al salir de su trabajo.

([2]) La parte demandante, posteriormente, desistió de su causa de acción contra el referido municipio.

([3]) En el escrito de estipulación que el 31 de mayo de 1984 radicaron las partes ante el foro de instancia se expresa, en lo pertinente, que:

cuando no presentó testigos oculares del accidente ocurrido, aportó además prueba testifical en apoyo de sus alegaciones. La parte demandada no presentó prueba otra alguna. En la sentencia que emitiera el tribunal de instancia declarando con lugar la demanda radicada dicho foro determinó, en adición a los hechos antes expresados, que la Carr. Est. 796 es una que, aun cuando contempla el tránsito de vehículos de motor en ambas direcciones, no contiene el ancho normal que se requiere para una carretera de un solo carril; que la misma tiene paseos de grama con desniveles sustanciales que drena muy pobremente, causando ello una condición conocida como *hydroplaning* en la cual las llantas de un vehículo de motor pierden contacto con la carretera (4) y, por consiguiente, causan la pérdida del control del vehículo por parte del conductor; que a pesar de que en el lugar donde apareció el vehículo del occiso existen cuerpos de agua a ambos lados de la carretera que se encuentran "a cuatro y seis pies de la carretera, con una pendiente negativa", la carretera está desprovista de vallas de seguridad; que no existe iluminación en dicho tramo de carretera, como tampoco rotulación de clase alguna. Es menester enfatizar que dichas determinaciones están basadas en el informe pericial rendido por el testigo perito de la parte demandante, Ingeniero Civil Ángel Allende, informe que fue admitido en evidencia *por estipulación de las partes* y en el cual se afirma que dichas condiciones existen, cuando menos, desde el 1975. (5)

---

"1. La parte demandada Estado Libre Asociado de Puerto Rico estipula toda la prueba anunciada por la parte demandante en el Informe de Conferencia con Antelación a Juicio.

"2. En específico se estipula el Informe sometido por el Perito Ingeniero Angel Allende, al igual que su capacidad como ingeniero según surge de su Resumé."

(4) Esto ocurre cuando la carretera está mojada, condición en la que se encontraba la carretera el día del accidente.

(5) Merece destacarse el hecho de que casi todas las conclusiones a que llega el perito en el mencionado informe encuentran apoyo en el Manual de

Citando como precedente a *Rodríguez* v. *Ponce Cement Corp.*, 98 D.P.R. 201, 207 (1969) —a los efectos de que la parte demandante en un pleito de daños y perjuicios, parte a quien le corresponde el peso de la prueba, una vez explica satisfactoriamente la falta de evidencia directa, puede descargar su responsabilidad mediante la presentación de prueba indirecta— el tribunal de instancia determinó, en síntesis y en lo pertinente, que había quedado satisfactoriamente establecido que "el automóvil del señor Báez cayó en las aguas del Lago Carraízo, *al apartarse de la superficie de rodaje* y caer por el barranco" y que era razonable concluir "que la omisión de los *elementos necesarios para hacer la carretera una segura* [en específico, las barreras de seguridad] fue *la causa de la muerte* del señor Báez, por lo que el Estado es responsable". (Énfasis suplido.) Expresó el foro de instancia, por último, que "la causa próxima del accidente" fue la ausencia de "protección suficiente para el viajero que imperaba en la carretera estatal 796". En su consecuencia, y en vista de las disposiciones del citado Art. 404 del Código Político de Puerto Rico, condenó al Estado al pago de unas determinadas sumas de dinero a favor de los demandantes.

Inconforme, acudió el Estado Libre Asociado de Puerto Rico ante este Tribunal mediante la radicación del correspondiente escrito de revisión. *En el mismo no se cuestiona la corrección de la determinación del tribunal de instancia a los efectos de que la Carr. Est. 796 adolece de unas medidas básicas y necesarias de seguridad ni la evaluación que de los daños sufridos por la parte demandante hiciera dicho foro, como tampoco se argumenta la ausencia de determinación por parte*

Ingeniería de Tránsito y Transportación publicado por el Instituto de Ingenieros de Tránsito y en el Manual de Dispositivos Uniformes para el Control del Tránsito en las Vías Públicas de Puerto Rico, publicado en el 1979 y certificado por el Secretario de Transportación y Obras Públicas de Puerto Rico.

*del foro de instancia, sobre negligencia concurrente del occiso.*
Se señala, sin embargo, que:

1. Erró el Honorable Tribunal sentenciador al resolver que la causa próxima del accidente fueron las condiciones de la carretera Núm. 796.
2. Erró el Honorable Tribunal de instancia al concluir que la "omisión de los elementos necesarios para hacer la carretera una segura fue la causa de la muerte del señor Báez" y al determinar que el Estado Libre Asociado de Puerto Rico es responsable de los daños y perjuicios sufridos por los demandantes.

Expedimos el auto de revisión solicitado.

## II

La obligación del Estado Libre Asociado de Puerto Rico de "manten[er] en buen estado" las carreteras estatales emana de las disposiciones del Art. 403 del Código Político de 1902 (3 L.P.R.A. sec. 421). Esa obligación es una de carácter "primaria e indelegable", no quedando relevado el Estado de la misma aun cuando haya contratado con un tercero la ejecución de obras respecto a las carreteras y aun cuando la "condición" causante del daño haya sido el resultado de la actuación del tercero. *Morales Muñoz v. Castro,* 85 D.P.R. 288, 293 (1962); *Resto v. P.R. Telephone Co.,* 97 D.P.R. 313, 319 (1969).

El citado Art. 404 del referido Código Político establece el grado, o el alcance, de la responsabilidad civil del Estado en casos en que un usuario de las mencionadas vías públicas sufra daño como consecuencia de la utilización de las carreteras. El mismo dispone:

El Estado Libre Asociado de Puerto Rico será responsable civilmente de los daños y perjuicios que se ocasionen a las personas o propiedades por desperfectos, falta de reparación o de protección suficientes para el viajero en cualquier vía de comunicación perteneciente al Estado Libre Asociado y a cargo del Departamento de Transportación y Obras Públicas,

excepto donde se pruebe que los desperfectos de referencia fueron causados por la violencia de los elementos y que no hubo tiempo suficiente para remediarlos.

Dicha disposición legal ha sido objeto de atención por este Tribunal en varias ocasiones en el pasado. Véanse: *Publio Díaz v. E.L.A.*, 106 D.P.R. 854 (1978); *Pérez Piñero v. E. L. A.*, 105 D.P.R. 391 (1976); *Resto v. P.R. Telephone Co.*, ante; *Morales Muñoz v. Castro*, ante, y *Rivera v. Pueblo*, 76 D.P.R. 404 (1954). Conforme las referidas decisiones dicho artículo de ley constituye "el *precepto especial a utilizarse* para evaluar *acciones por daños* que se ocasionen a personas o propiedades *en las vías públicas estatales*, cuando los mismos *fuesen motivados por* cualesquiera de estas condiciones: 1) desperfectos; 2) falta de reparación; 3) falta de protección suficient[e] para el viajero". (Énfasis suplido.) *Publio Díaz v. E.L.A.*, ante, pág. 862; que demostrado por la parte actora que sufrió daños en la utilización de una vía pública como consecuencia de una de las condiciones antes mencionadas, a menos que el Estado pueda demostrar que la condición imputada fue motivada por la violencia de los elementos y que no hubo tiempo suficiente para remediarla, éste es responsable por los daños ocasionados, *Resto v. P.R. Telephone Co.*, ante, págs. 319–320; *Publio Díaz v. E.L.A.*, ante, pág. 863; que ante una condición que amenaza la seguridad de los usuarios de las carreteras estatales, el Estado viene en la obligación de tomar aquellas medidas necesarias, inclusive el cierre total de la vía pública en controversia, en prevención de la ocurrencia del daño, *Publio Díaz v. E.L.A.*, ante, pág. 865; que la negligencia concurrente de la parte actora no derrota su acción bajo la referida disposición legal, *Publio Díaz v. E.L.A.*, ante, pág. 867; *Morales Muñoz v. Castro*, ante, pág. 295, y que al "observar y comparar con detenimiento el contenido del Art. 404 con el 1802 [del Código Civil], si bien son diferentes, detectamos cierta tangencia entre las obligaciones que ambos exigen". (Énfasis suplido.) *Publio Díaz v. E.L.A.*, ante, pág. 863.

## III

Nuestra jurisprudencia relativa a reclamaciones de daños y perjuicios bajo el Art. 1802 de nuestro Código Civil [6] establece, como regla general, que todo perjuicio material o moral da lugar a reparación si concurren tres requisitos o elementos: primero, se *establece* la realidad del daño sufrido; segundo, *existe* un nexo causal entre el daño y la acción u omisión de otra persona, y tercero, dicho acto u omisión es culposo o negligente. *Pérez Escolar* v. *Collado*, 90 D.P.R. 806, 811 (1964); *Hernández* v. *Fournier*, 80 D.P.R. 93, 96–97 (1957).

Ahora bien, en un pleito de daños y perjuicios radicado al amparo del citado Art. 404 del Código Político —*debido a las disposiciones particulares del mismo*— la "negligencia" del Estado Libre Asociado de Puerto Rico *queda establecida* cuando éste —frente a prueba de la parte actora que demuestre satisfactoriamente la existencia de "desperfectos, falta de reparación o de protección suficientes para el viajero" en la vía pública en controversia— no puede demostrar que los "desperfectos de referencia fueron causados por la violencia de los elementos y que no hubo tiempo suficiente para remediarlos". Dicho de otra forma la referida disposición legal *releva* a la parte demandante de probar la "negligencia" del Estado; todo lo que se le requiere, *respecto a este aspecto,* es prueba de los referidos desperfectos, *"concediendo"* el Estado la *negligencia* al no presentar prueba satisfactoria de que los mismos se debieron a la violencia de los elementos y que no tuvo tiempo suficiente para repararlos. [7]

Naturalmente que la parte demandante no queda exonerada de presentar prueba de la "realidad del daño sufrido",

---

[6] 31 L.P.R.A. sec. 5141.

[7] Es por esta razón que en casos bajo el Art. 404 del Código Político, 3 L.P.R.A. sec. 422, se hace innecesario la consideración del criterio (*test*) establecido en *Soc. Gananciales* v. *G. Padín Co., Inc.,* 117 D.P.R. 94 (1986), a los efectos de determinar la negligencia por omisión.

*como tampoco queda relevada de probar el nexo causal entre ese daño y los "desperfectos" que tiene la carretera.* Nótese que el citado Art. 404 establece que el Estado será responsable civilmente de "los daños y perjuicios que se *ocasionen* a las personas o propiedades *por* desperfectos, falta de reparación". (Énfasis suplido.)

Somos del criterio que no debe haber duda sobre el hecho de que el referido Art. 404 requiere o contempla que se pruebe un nexo de causalidad entre el daño sufrido y las "condiciones" de la vía pública en donde ocurre el accidente por el cual se reclama. Merece destacarse que el estatuto en cuestión, como hemos visto, utiliza o contiene la palabra "ocasionen". Ocasionar, según el *Diccionario de la Lengua Española*, 20ma ed., Madrid, Ed. Espasa-Calpe, 1984, T. II, pag. 969, significa "[s]er causa o motivo para que suceda una cosa". En adición, es principio firmemente establecido por nuestra jurisprudencia que "[e]l deber de indemnizar *presupone nexo causal entre el daño y el hecho que lo origina, pues sólo se han de indemnizar los daños que constituyen una consecuencia del hecho que obliga a la indemnización".* (Énfasis suplido.) *Estremera* v. *Inmobiliaria Rac, Inc.,* 109 D.P.R. 852, 856 (1980) ; *López* v. *Hosp. Presbiteriano, Inc.,* 107 D.P.R. 197 (1978) ; J. Castán Tobeñas, *Derecho civil español, común y foral,* 10ma ed., Madrid, Ed. Reus, 1967, T. 3, pág. 193.

En el presente caso los demandantes, en adición a la prueba sobre daños, presentaron evidencia de que el tramo de la Carr. Est. 796 en que ocurrió el accidente era uno —según surge del informe del perito Allende— que adolecía de "desperfectos, falta de reparación o de protección suficientes para el viajero", lo que hacía que el mismo fuera uno "extremadamente peligroso e inseguro y que no cumple con los requisitos mínimos de seguridad hacia los conductores". Dicho informe, como hemos visto, fue sometido en evidencia por estipulación de las partes. *No podemos sustraernos del hecho de que el Estado se "cruzara de brazos y aceptara" las determinaciones*

*y conclusiones del referido informe no obstante contar con vastos recursos para, de entenderlo procedente, refutarlo.* No cabe otra conclusión: el tramo de la Carr. Est. 796, donde el vehículo del occiso Báez Báez "abandonó" la vía de rodaje y cayó a las aguas del Lago Carraízo, adolece de "desperfectos . . . [y] de protección suficientes para el viajero". No habiendo presentado prueba el Estado de que las condiciones que afectaban la mencionada vía pública "fueron caus[a]dos por la violencia de los elementos y que no hubo tiempo suficiente para remediarlos" *quedó establecida la negligencia del Estado Libre Asociado de Puerto Rico.*

Restaría, por tanto, *únicamente* determinar si los daños sufridos por la parte demandante fueron ocasionados por, o a consecuencia de, las condiciones defectuosas en que se encontraba la mencionada Carr. Est. 796; en otras palabras, *debe resolverse si existe en el presente caso relación o nexo causal entre la realidad del daño sufrido y la negligencia, por omisión, del Estado Libre Asociado de Puerto Rico.*

## IV

Según J. Puig Brutau, *Fundamentos de Derecho Civil,* Barcelona, Ed. Bosch, 1983, T. II, Vol. III, pág. 92:

Las ciencias naturales explican cuándo un fenómeno es el efecto de otro, pero en el ámbito jurídico no es posible hacer depender de criterios físicos o naturales la determinación de la persona o personas obligadas a indemnizar un daño. El Derecho ha de tener su propio método para saber cuándo un sujeto es responsable. Esta responsabilidad depende de que se pueda establecer una *imputación razonable entre el acto u omisión del demandado y el daño sufrido por el demandante.* (Énfasis suplido.)

Esta *diferencia* entre la *causalidad físico-natural* y la *causalidad jurídica* responde, según H. M. Brau Del Toro, a "razones de política pública para evitar que el demandado tenga que responder por resultados extremadamente remotos

y especulativos y para evitar que se produzca una cadena de causalidad infinita que genere una secuencia interminable de pleitos y lleve a resultados absurdos". (⁸)

Como sabemos, hay diversas teorías para determinar la existencia de causalidad legal o jurídica, unas de entronque civilista, otras originadas en el derecho angloamericano. Nuestras decisiones han hecho referencia a unas y a otras en el pasado. Pero, como expresáramos en *Soc. de Gananciales* v. *Jeronimo Corp.*, 103 D.P.R. 127, 134 (1974) (reiterado explícitamente en *Jiménez* v. *Pelegrina Espinet*, 112 D.P.R. 700, 706 (1982)):

> . . . *La que ha merecido la mayor atención y la que rige fundamentalmente nuestras decisiones*—aunque a veces la terminología empleada deriva del derecho norteamericano, inaplicable a este género de problemas—*es la teoría de la causalidad adecuada, conforme a la cual "no es causa toda condición sin la cual no se hubiera producido el resultado, sino la que ordinariamente lo produce según la experiencia general"*. Santos Briz, *Derecho de Daños*, Ed. Revista de Derecho Privado, Madrid, 1963, págs. 215 y ss. (Énfasis suplido.)

Decir que una actuación u omisión es la causa adecuada es lo mismo que decir que esa actuación u omisión *puede producir* un efecto, *no que necesariamente* tenga que dar lugar al mismo. A. De Cossío, *La causalidad en la responsabilidad civil: estudio del Derecho español*, 1966 An. Der. Civ. 527 y ss. (1966).

Estas expresiones, sin embargo, por sí solas carecen de contenido que puedan guiar al juzgador en un caso determinado. Como correctamente señalan Brau Del Toro y Delgado Hernández "para interpretar su recto sentido e impartirle contenido *es necesario recurrir a factores, o criterios, o ín-*

---

(⁸)H. M. Brau Del Toro, *Los daños y perjuicios extracontractuales en Puerto Rico*, 2da ed. rev., San Juan, Pubs. J.T.S., 1986, Vol. 2, Cap. XI, pág. 667.

*dices diversos*". (Énfasis suplido.) (⁹) Dice Orgaz que habrá conexión causal entre un acto y un resultado cuando ese acto haya contribuido de hecho a producir un resultado; esto es, ha sido una de las condiciones sine qua non de él y además debía normalmente producirlo conforme al orden natural y ordinario de las cosas. A la inversa nos dice no hay conexión causal cuando la acción deba considerarse indiferente según la experiencia de la vida para la producción del daño, o bien cuando el acto, aunque factor esencial del resultado, solamente lo ha producido por la intervención de circunstancias extraordinarias e imprevisibles. (¹⁰)

De Cossío, *op. cit.*, pág. 537, uno de los tratadistas españoles que más ha estudiado el problema de la causalidad, sustenta que la causalidad "*únicamente* tiene sentido jurídico cuando sea prevista o previsible por el sujeto". (Énfasis en el original.) A. De Cossío reiteró esta posición en su obra *Instituciones de Derecho Civil*, Madrid, Ed. Alianza, 1975, Vol. I, pág. 303 *et seq*.

En cuanto *a cómo ha de realizarse el análisis de previsibilidad*, De Cossío señala:

> Este juicio [el de ser previsible el resultado dañoso], formulado por el juez en el momento oportuno, ha de basarse, no en el saber del sujeto que cometió el acto, *sino en la experiencia general de la comunidad,* en el juicio que pudiéramos llamar común; *lo que cualquier hombre razonable podía haber previsto. El juicio de probabilidad, dice Rumelín, debe comprender todas aquellas circunstancias que existían en el momento de llevarse a cabo la acción* (aunque fueran conocidas después), *y además aquellas otras cuya producción posterior según la experiencia humana, debía ser prevista,* en cuanto eran favorecidas por aquel acto. Este conoci-

---

(⁹) H. M. Brau Del Toro y P. Delgado Hernández, *Reflexiones sobre los efectos jurídicos de la adopción por nuestro Tribunal Supremo de la doctrina civilista de la causalidad adecuada para imponer responsabilidad extracontractual*, 44 Rev. C. Abo. P.R. 301, 310 (1983).

(¹⁰) Citado por Brau Del Toro, *op. cit.* pág. 698.

miento será el que hubiera tenido un hombre medio por regla general, *pero también habrán de ser tenidas en cuenta las condiciones que por razón de su profesión o de cualquier otra circunstancia pudo tener el agente al efectuar el acto.* (Énfasis suplido.) *La causalidad en responsabilidad civil, op. cit.,* pág. 532.

Varios años más tarde, De Cossío reiteró:

[P]ero este juicio de previsión no es un juicio meramente subjetivo, *sino más bien el resultado de una valoración objetiva que el Juez ha de llevar a cabo, teniendo en cuenta, no sólo su personal criterio, sino además, y sobre todo, el juicio general que cualquier hombre medio se hubiera debido formar acerca de la posibilidad y probabilidad del daño que había de originarse, juicio que en este caso se convierte en norma de conducta para todos,* en virtud de la obligación general de diligencia que nos es impuesta por la vida social, tratándose, por tanto, de un juicio normativo. (Énfasis suplido.) *Instituciones de Derecho Civil, op. cit.,* pág. 304.

Como podemos notar, en términos generales, la teoría de la causalidad adecuada *conlleva el llevar a cabo una valoración de las condiciones en virtud de un juicio previo de posibilidad. Instituciones de Derecho Civil, op. cit.,* pág. 304. Es así que *la causalidad está ligada a la previsibilidad,* por tal razón para establecer la causa de un daño es necesario hacer *un juicio de probabilidad* y que el juzgador se pregunte *si la acción u omisión del demandado es por sí misma capaz de ocasionar el daño en cuestión.* Si la respuesta es en la afirmativa, entonces se dice que la acción u omisión es adecuada para causar el daño. A. Orgaz, *El Daño Resarcible,* 2da ed., Buenos Aires, Bibliografía Omeba, 1960, pág. 70.

V

Habiendo quedado establecido en el presente caso: la realidad del daño sufrido por la parte demandante, la negligencia del demandado Estado Libre Asociado de Puerto Rico, consistente la misma en las condiciones peligrosas en que se encon-

traba la Carr. Est. 796, y que en nuestra jurisdicción la teoría aplicable en materia de causalidad lo es la de "causalidad adecuada", nos resta por considerar si existe evidencia "suficiente en derecho" para poder determinar la existencia de nexo causal entre el daño sufrido y el "hecho" que, alegadamente, lo originó, esto es, la "negligencia del Estado". *Estremera* v. *Inmobiliaria Rac, Inc.*, supra.

Como es sabido, de ordinario, el peso de la prueba en esta cuestión le corresponde a la parte actora. *Zambrana* v. *Hospital Santo Asilo de Damas*, 109 D.P.R. 517 (1980); *Consolidated Express* v. *Maryland Cas. Co.*, 102 D.P.R. 480 (1974); *Vda. de Delgado* v. *Boston Ins. Co.*, 99 D.P.R. 714 (1971); *Rodríguez* v. *Ponce Cement Corp.*, 98 D.P.R. 201 (1969); *Murcelo* v. *H. I. Hettinger & Co.*, 92 D.P.R. 411 (1965).

La interrogante sobre si el demandante cumplió o no con dicha obligación resulta de fácil solución para el juzgador cuando existe, y se presenta durante el proceso, prueba directa de todo lo ocurrido. Distinta es la situación cuando, como en el presente caso, la parte demandante se ve imposibilitada de así hacerlo, viéndose obligado el juzgador a resolver el caso a base de prueba indirecta o circunstancial.

En relación a esta clase de situaciones, expresamos hace veintiún (21) años que:

Sabemos que la parte que sostiene la afirmativa en la cuestión deberá presentar la evidencia para probarla.—Arts. 1168, Código Civil y 108 y 162, pár. 5, Ley de Evidencia. Pero, por regla general, la ley no exige aquel grado de prueba que, excluyendo la posibilidad de error, produzca absoluta certeza; porque tal prueba—asegura la propia ley—es rara vez posible. Sólo se exige la certeza moral, o un grado de prueba que produzca convicción en un ánimo no prevenido. *No se tiene que probar el caso con exactitud matemática mediante evidencia directa, ni de modo concluyente, ni que produzca un grado tan perfecto de convicción que no admita la posibilidad de la prueba en contrario.* El litigante puede pro-

bar su caso con evidencia indirecta, que es de dos clases, inferencias y presunciones. Es inferencia, la deducción que de los hechos probados, o acreditados completamente, hace en su discernimiento el juzgador. A veces se denomina presunción *hominis. Representa ese discernimiento una actividad humana valorativa de comparación o confrontación, un proceso interno que constituye, a juicio del profesor Serra Domínguez, algo inabordable; el movimiento de la razón yacente en el hombre.*

En este tipo de acción la parte demandante luego de haber presentado evidencia a cuya luz una persona razonable pueda quedar convencida de que el acto dañoso se debe a la culpa u omisión de la demandada no está obligada a eliminar o excluir toda otra posible causa del suceso del cual se deriva la responsabilidad exigida. Aun en el campo penal, cuando El Pueblo sólo ofrece evidencia circunstancial de culpabilidad, ya no tiene que ser ésta inconsistente con cualquier hipótesis razonable de inocencia. *Pueblo* v. *Bonilla,* 78 D.P.R. 152 (1955). (Énfasis suplido.) *Murcelo* v. *H. I. Hettinger & Co.,* supra, págs. 426–427.

Dichas expresiones han sido ratificadas en innumerables ocasiones por este Tribunal. Así, por ejemplo, en *Rodríguez* v. *Ponce Cement Corp.,* supra, págs. 207–208, expresamos que, explicada satisfactoriamente la falta de evidencia directa por ausencia de testigos, todo cuanto se requiere de la parte demandante es que presente prueba a cuya luz *una persona razonable pueda quedar convencida* de que el acto generador de la responsabilidad es atribuible a la parte demandada, y que el hecho de que el accidente pueda obedecer a otras causas no es suficiente por sí solo para derrotar la reclamación por cuanto sólo es necesario que el tribunal estime que la acción u omisión indicada por el acto fue la que *con mayores probabilidades* causó el accidente. En *Vda. de Delgado* v. *Boston Ins. Co.,* supra, pág. 725, añadimos que "no es necesario que el demandante excluya toda probabilidad de que su lesión fue ocasionada por la negligencia de otras personas aparte del demandado. Por parte del demandado no es suficiente hacer

mera referencia a otras posibles causas . . . de las que el demandado no es responsable y que pudieron ocasionar el daño". En *Consolidated Express* v. *Maryland Cas. Co.*, supra, pág. 484, indicamos que en esta clase de situaciones "basta la evidencia indirecta cuando mueve la razón del hombre hacia la inferencia lógica". Por último, en *Zambrana* v. *Hospital Santo Asilo de Damas*, supra, pág. 521, expresamos —ya *en cuanto a casos de daños y perjuicios en general*— que:

> En muy raras ocasiones es posible determinar un hecho con certeza o exactitud matemática. Exigir ese tipo de prueba a un litigante equivaldría prácticamente a requerirle un imposible. Por ello, la ley y la jurisprudencia se limitan a requerir que los casos se prueben por preponderancia de prueba, que es tanto como establecer como hechos probados *aquellos que con mayores probabilidades ocurrieron.* (Énfasis suplido.)

Argumenta el recurrente Estado Libre Asociado de Puerto Rico, en el alegato que radicara, que la parte demandante falló en demostrar el nexo causal entre "las condiciones de la Carretera 796 y la ocurrencia del accidente en que perdió la vida" el occiso, y que "lo más razonable y lógico es concluir que el accidente fue producido por la pérdida del control del vehículo por parte del conductor lo que lo llevó a abandonar el área de rodaje y caer al lago". No estamos de acuerdo; veamos por qué.

Es correcto que, debido a la ausencia de testigos oculares, no existe prueba sobre cuál fue el "hecho originador o básico" en la cadena de eventos que tuvo como consecuencia que el automóvil del occiso cayera en las aguas del Lago Carraízo y éste pereciera de asfixia por sumersión. *No existe, sin embargo, hecho alguno del cual se pueda razonablemente inferir que lo que causó o precipitó el accidente no fuera otra cosa que alguno, o el conjunto, de los desperfectos de que adolece la Carr. Est. 796.* En otras palabras, no hay duda de que dentro del amplio y fascinante campo de las posibilidades es *posible*

que el occiso hubiera estado conduciendo su vehículo a una velocidad exagerada, o que estuviera conduciendo bajo los efectos de bebidas embriagantes, o que se quedara dormido, o que fuera impactado por otro vehículo, o que hubiera sido objeto de un acto violento y delictivo, o que el carro sufriera de desperfectos mecánicos que causaron el accidente, y que como consecuencia de uno de esos sucesos cayera a las aguas del Lago Carraízo. *El problema con dicho argumento, repetimos, es que no existe indicio alguno que pueda servir de base a ello.* No debemos olvidar que el Estado investigó el accidente y la muerte ocurrida a través de dos de sus agencias o instrumentalidades: la Policía y el Departamento de Justicia de Puerto Rico. No hay reporte alguno que indique, por ejemplo, que se hubieran encontrado huellas de freno en la carretera, lo que podría indicar exceso de velocidad. No hay prueba de que el occiso diera positivo de haber ingerido bebidas alcohólicas; [11] por el contrario, el tribunal de instancia le dio crédito al testimonio de la viuda del occiso a los efectos de que éste no ingería licor al salir de su trabajo. No hay evidencia de que el vehículo del occiso mostrara raspazos o rastros de pintura, indicativo ello de que el vehículo hubiera sido impactado por otro automóvil. Tampoco, según el protocolo de autopsia, mostraba el cadáver signos de violencia o de actividad delictiva. Por otro lado, no es lógico suponer que una persona que sale de su trabajo a las 5:00 P.M. se quede dormida al volante de su automóvil una hora más tarde. Por último, no hay reporte de agencia alguna del Estado que demuestre que el vehículo del occiso adoleciera de desperfectos mecánicos.

*Por el contrario, sí existe prueba de la cual se puede razonablemente inferir que el accidente se debió a alguna o varias, de las condiciones peligrosas de que adolecía la Carr. Est. 796.* Veamos: la carretera, a pesar de contemplar tránsito en am-

---

[11] Como dijéramos anteriormente, el avanzado estado de descomposición del cadáver impidió que se realizara el examen toxicológico.

bas direcciones, no tiene ni tan siquiera el ancho requerido para una de un solo carril, lo que obviamente puede causar que un automóvil abandone fácilmente la vía de rodaje al encontrarse el conductor con el menor de los obstáculos o dificultades. Dicha carretera adolece, en adición, de la condición conocida como *hydroplaning*, cuando está mojada, causando la misma la fácil pérdida del control del automóvil ya que las llantas pierden el contacto o agarre con la carretera; condición que es agravada por el pobre drenaje de que adolece la misma. *Merece destacarse el hecho que según el reporte de accidente suscrito por la Policía de Puerto Rico —admitido en evidencia sin objeción del demandado recurrente— la tarde del accidente la carretera en cuestión estaba mojada.* ([12]) Como si lo anteriormente expresado no fuera suficiente, tenemos que la mencionada carretera carece de paseo, únicamente existiendo una pendiente que desemboca en las aguas del Lago Carraízo sin que existan barreras de seguridad que impidan la caída de un vehículo a dicho lago.

En vista de todo lo antes expresado somos del criterio que en el presente caso la parte demandante presentó suficiente prueba circunstancial de la cual una persona razonable puede lógicamente inferir —de acuerdo a la experiencia general y basados en criterios de probabilidad— que el automóvil conducido por el occiso se salió de la vía de rodaje y cayó al Lago Carraízo debido a los "desperfectos, falta de reparación o de protección suficientes" de que adolecía la Carr. Est. 796; "*condiciones" que por sí solas eran suficientes para causar el accidente ocurrido y sin las cuales no se hubiera producido el mismo.* Este trágico desenlace era un resultado enteramente previsible para el Estado si consideramos que éste cuenta con

---

([12]) Ello así surge del *Exhibit* 3A, el cual fue *estipulado* por las partes. La información que contiene dicho informe —aun cuando el mismo fue redactado con posterioridad al día del accidente— se refiere a *las condiciones en que se encontraba la carretera el día del accidente,* evidencia que constituye prueba incontrovertida en el caso.

personal especializado en el diseño, inspección y reparación de carreteras estatales, y, sobre todo cuando consideramos que tenía conocimiento de que existían dichas condiciones desde, cuando menos, el 1975. Este juicio valorativo nos lleva a concluir que la exclusiva negligencia del Estado Libre Asociado de Puerto Rico fue la causa adecuada de la muerte del señor Báez Báez.

## VI

Por todo lo anteriomente expresado es que somos de la opinión que la conclusión, *basada en conjeturas y suposiciones*, a los efectos de que el accidente ocurrido se debió tanto a la negligencia del Estado como a la "negligencia" del causante de los demandantes —de paso decretando que este último "fue negligente en un setenta por ciento (70%) y el Estado" en el remanente— parece ser una conclusión producto precisamente del campo de la especulación o del fascinante mundo del laboratorio académico; las bases de cuya decisión definitivamente afectan la litigación en nuestra jurisdicción. A partir de la presente decisión, los abogados en la práctica de la profesión tendrán que estar preparados y en posición de refutar no sólo la prueba que presente la parte contraria durante el juicio sino que las inferencias infundadas que de la misma este Tribunal tenga a bien realizar.

Por último, merece enfatizarse que "justicia a medias" no es justicia. En otras palabras, no se le hace verdadera justicia a aquél a quien, teniendo derecho al "todo" se le concede menos.

—O—

Opinión disidente emitida por la Juez Asociada Señora Naveira de Rodón a la cual se une el Juez Presidente Señor Pons Núñez.

430

Con el debido respeto de otros criterios, pasamos a exponer el nuestro. La evidencia aportada(¹) en este caso está extensamente reseñada, tanto en la opinión concurrente como en la concurrente y disidente.

La acción surge como resultado de un desgraciado accidente de automóvil ocurrido en o alrededor del 30 de enero de 1981, en el cual perdió la vida el conductor, Ángel P. Báez Báez, al salirse su vehículo de la vía de rodaje e ir a caer en el Lago Carraízo. No hay testigos oculares de éste. Tampoco existe prueba "circunstancial *coetánea* al accidente sobre qué realmente lo causó y las razones por las cuales Báez Báez abandonó la zona asfaltada de rodaje" (opinión concurrente, pág. 403) ni sobre las condiciones de la carretera (con excepción de las tres (3) fotografías del lugar que tomó la Policía de Puerto Rico el día que investigaron el accidente). La prueba principal aportada para establecer las condiciones de la Carr. Núm. 796 al momento de ocurrir el accidente fue el informe pericial del Ing. Ángel L. Allende.(²) En dicho informe se indica que la inspección de la Carr. Núm. 796 y del lugar del accidente en la cual éste se basa, se realizó el 1ro de octubre de 1983, casi dos (2) años después del desgraciado evento.(³)

(¹) El caso se sometió a base de estipulaciones. Sólo se recibió testimonio del fiscal Rafael A. Dávila y del policía insular Carmelo Fernández en cuanto a la negligencia, y de la señora Nancy Díaz Vda. de Báez en cuanto a los daños.

En relación con la negligencia del Estado se estipuló la siguiente prueba documental: (1) fotografías del área del accidente; (2) copia del Informe de Accidentes de Tránsito de la Policía; (3) copia del Informe de Persona Desaparecida y del Suplemento; (4) reglamentos estatales y federales aplicables a la construcción de carreteras; (5) informe del perito Ing. Ángel L. Allende; (6) fotografías tomadas por la Policía de Puerto Rico del vehículo accidentado, del lugar del accidente y del cadáver.

(²) El propósito del informe del ingeniero Allende no fue reconstruir cómo ocurrió el accidente, sino "[d]eterminar si el tramo de la Carretera Estatal P.R. 796 cumple con requisitos mínimos de seguridad entre el Km. 3.8 y el 4.2".

(³) La inspección ocular que realizó el juez del lugar del accidente se hizo el 17 de octubre de 1983.

A pesar de ser un accidente sin testigos oculares no se presentó prueba pericial para tratar de reconstruir la forma en que probablemente ocurrió. ([4])

Coincidimos con ambas opiniones en que "la parte demandante en un pleito de daños y perjuicios, parte a quien le corresponde el peso de la prueba, una vez explica satisfactoriamente la falta de evidencia directa, puede descargar su responsabilidad mediante la presentación de prueba indirecta". (Opinión concurrente y disidente, pág. 415.) También estamos de acuerdo en que para poder imponerle responsabilidad al Estado al amparo del Art. 404 del Código Político, 3 L.P.R.A. sec. 422, la parte tiene que probar no sólo el acto negligente por parte del Estado, en este caso, "desperfectos, falta de reparación o de protección suficientes" en la carretera y el daño causado, sino también la relación o nexo causal entre el daño sufrido y la negligencia del Estado. En lo que estamos en desacuerdo con ambas opiniones es en la conclusión a que éstas llegan de que bajo las circunstancias específicas de este caso la parte demandante logró probar la relación causal entre el daño y el acto negligente del Estado.

Para que proceda dar por probado un hecho a base de una inferencia derivada de evidencia circunstancial, es necesario que haya una relación racional entre el hecho básico probado y el inferido. *Murcelo v. H. I. Hettinger & Co.*, 92 D.P.R. 411 (1965); E. L. Chiesa, *Práctica Procesal Puertorriqueña— Evidencia*, San Juan, Pubs. J.T.S., 1983, Análisis Editorial, Vol. I, Cap. III, págs. 41–46; *McCormick, Evidence*, Cap. 36, Sec. 345, pág. 985 (3ra ed. 1984); *Jim Crockett Promotion, Inc. v. City of Charlotte*, 706 F.2d 486, 490 (4to Cir. 1983).

---

([4])R. S. Kuhlman, *Killer Roads: From Crash to Verdict*, Virginia, The Michie Co., 1986, Cap. 16, Sec. 16-1; *Adkins v. Chicago, Rock Island & Pacific Railroad Co.*, 274 N.E.2d 507, 516 (Ill. 1971); *Carlson v. Hudson*, 312 N.E.2d 19–21 (Ill. 1974). Para una posición en contra de la utilización de este tipo de peritaje, véase *Zachery v. Wheeler*, 511 F. Supp. 591 (E.D. Tenn. 1981).

El hecho probado tiene que ser uno del cual un hombre razonable pueda inferir el hecho alegado. La razón y la experiencia deben apoyar la inferencia. *Tot* v. *United States*, 319 U.S. 463, 467 (1943) ; *Jim Crockett Promotion, Inc.* v. *City of Charlotte*, supra, pág. 490. La aplicación de estos principios de derecho a situaciones en específico ha generado gran controversia y producido innumerables escritos, ya que "en el último análisis el dictamen del juez necesariamente tiene que descansar en su opinión personal, que es producto del sentido común y la experiencia propia, en cuanto a límites de inferencias razonables que se pueden hacer de los hechos probados". (Traducción nuestra.) *McCormick, op. cit.*, Cap. 36, Sec. 338, pág. 954.

El hecho básico que el tribunal encontró probado en este caso, del cual se pretende inferir que el Estado es responsable por el accidente que causó daños a la parte demandante, es que la Carr. Núm. 796 donde ocurrió el accidente adolecía de desperfectos y no ofrecía suficiente seguridad y protección a los viajeros que transitaban por ella. (Véanse: opinión concurrente, págs. 398 y 410; opinión concurrente y disidente, págs. 401 y 427.)

Analicemos las posiciones asumidas en las dos opiniones. En éstas se pretende, por vía de un precedente, crear una presunción controvertible del tipo concluyente o mandatorio.[5] Esto significa que en relación con un accidente de automóvil ocurrido en una carretera estatal, donde no haya evidencia directa del hecho generador del mismo, una vez probado el hecho básico de la negligencia del Estado (desperfectos en la carretera o falta de protección suficiente), en ausencia de

---

[5] "La presunción mandatoria o concluyente es aquella en la que, establecido el hecho básico A, si la parte afectada no presenta evidencia para rebatir o refutar el hecho presumido B, *el juzgador queda obligado a inferir el hecho presumido B.*" (Énfasis suplido.) E. L. Chiesa, *Práctica Procesal Puertorriqueña—Evidencia*, San Juan, Pubs. J.T.S., 1983, Análisis Editorial, Vol. I, Cap. III, pág. 40.

prueba por parte del Estado "sobre cuál fue el 'hecho originador o básico' en la cadena de eventos que tuvo como consecuencia [dicho accidente]" (opinión concurrente y disidente, pág. 426), el tribunal tiene necesariamente que inferir el nexo causal: encontrar probado que el accidente se debió a la exclusiva negligencia del Estado. Discrepamos de esta posición. Ni la experiencia ni la razón sugieren que sólo porque exista una condición de peligrosidad en una carretera y que en ésta haya ocurrido un accidente de automóvil no explicado, de estos dos hechos, sin más, (⁶) hay que necesariamente inferir que el accidente se debió a las condiciones de peligrosidad de la carretera o que lo más probable es que así fuera. En el caso de autos el perito se limitó a hacer un informe de las condiciones de la Carr. Núm. 796 basado principalmente en una inspección ocular hecha casi dos (2) años después de ocurrido el accidente. No se presentó prueba pericial para tratar de reconstruir la forma en que éste ocurrió. (⁷) Bajo estas circunstancias estimamos que no existe la conexión racional necesaria entre el hecho básico y el hecho inferido. Estamos frente a meras especulaciones o conjeturas en las cuales no puede apoyarse una determinación de responsabilidad.

La opinión concurrente va más allá. Infiere la negligencia concurrente entre el Estado y el occiso Báez Báez de una combinación de hechos básicos e inferencias. La negligencia concurrente de Báez Báez la infiere de lo siguiente: (1) el hecho del accidente no explicado en sí; "de haber Báez Báez man-

---

(⁶) Aunque la opinión concurrente y disidente, pág. 426, destaca en apoyo de su tesis que del informe de la Policía se desprende que en "la tarde del accidente la carretera en cuestión estaba mojada", cabe señalar que dicho informe se está refiriendo a las condiciones de la carretera el día en que se investigó el accidente, cuatro días después de que éste ocurriera. No hay evidencia, ni directa ni circunstancial, sobre las condiciones de la carretera el día en que ocurrió el accidente.

(⁷) Sobre prueba pericial para reconstruir la forma en que ocurren los accidentes, véase nota al calce 4.

tenido su automóvil dentro de la zona asfaltada de rodaje
—que era recta— no hubiese ocurrido el accidente"; que para
precipitarse en el Lago realizó "un viraje y transitó por la
grama"; (2) de las fotografías del vehículo accidentado,
"cayó y se hundió en el lago con la carrocería invertida . . .
[con] la parte delantera . . . hacia la carretera" (opinión con-
currente, pág. 404,), y (3) del informe del perito ingeniero
Allende donde se citan algunas estadísticas sobre la Carr.
Núm. 796 de éstas se concluye que "sin contratiempo, de día
y de noche, han discurrido miles de vehículos en múltiples oca-
siones bajo distintas condiciones climatológicas". (Opinión
concurrente, pág. 409.) De estos hechos básicos que el Tribunal
consideró probados se infiere "que Báez Báez —por razones
que no sabemos— perdió el control del automóvil, no pudo de-
tenerlo y moviéndose a velocidad indeterminada, pero suficien-
temente excesiva, se salió de la zona pavimentada de rodaje,
siguió sobre el paseo de grama y violentamente cayó al lago".
(Opinión concurrente, pág. 407.) Además se analizan distin-
tas disposiciones de la Ley de Tránsito de Puerto Rico. De las
inferencias, y del análisis de la Ley de Tránsito de Puerto
Rico, se llega a la inferencia crucial de que Báez Báez "incu-
rrió en negligencia activa al transitar a una velocidad rela-
tivamente excesiva" (opinión concurrente, pág. 409) y que
"fue negligente en una setenta por ciento (70%)". (Opinión
concurrente, pág. 409.)

Estimamos que tanto la inferencia sobre la relación causal
entre la negligencia del Estado y el daño, como la de la negli-
gencia del conductor Báez Báez son especulativas, meras con-
jeturas. Para llegar a la determinación de que el accidente se
debió a la negligencia concurrente del Estado y Báez Báez, se
entrelazan estas dos inferencias. Bajo estas circunstancias
somos de la opinión que no existe la conexión racional necesa-
ria entre los hechos básicos que el Tribunal consideró proba-

dos [8] y los inferidos para poder sostener la determinación de negligencia concurrente a la que se llega.

Por todo lo antes expuesto, concluimos que el Tribunal no tuvo ante sí prueba suficiente, ya fuere directa o circunstancial, ni para poder sostener la determinación de responsabilidad exclusiva del Estado ni la de negligencia concurrente del Estado y Báez Báez. La acción, por ende, debío desestimarse.

—O—

Voto particular emitido por el Juez Asociado Señor Hernández Denton.

Después de un análisis sereno, desapasionado y reflexivo de los autos originales, la prueba testifical y documental, así como los planteamientos de las partes, he decidido endosar la opinión concurrente emitida por el Juez Asociado Señor Negrón García. Su ponencia, en la que se apuntala la sentencia del Tribunal, no solamente está basada en los principios fundamentales de nuestro ordenamiento jurídico vigente, sino que también constituye la más justa solución de este pleito originado en un trágico accidente de automóvil en una carretera rural.

Por la naturaleza de la controversia, y en vista de que en instancia las partes estipularon la prueba documental y pericial, este Tribunal en estricto derecho está en las mismas condiciones que el foro de instancia. *Torres Arzola* v. *Policía de P.R.*, 117 D.P.R. 204 (1986); *Pueblo* v. *Uriel Álvarez*, 112 D.P.R. 312, 318 (1982); *Castrillo* v. *Maldonado*, 95 D.P.R. 885, 889 (1968); *West India Mach.* v. *Srio. de Hacienda*, 89

---

[8] Somos de la opinión que tampoco se aportó prueba suficiente para sostener algunas de las determinaciones sobre la condición de la Carr. Núm. 796 *al momento del accidente*. No cumplió con su "obligación de poner al tribunal en condiciones de poder hacer una determinación clara y específica sobre negligencia mediante la presentación de prueba a esos efectos". *Cotto* v. *C.M. Ins. Co.*, 116 D.P.R. 644, 651 (1985).

D.P.R. 115 (1963) ; *Central Igualdad, Inc.* v. *Srio. Hacienda,* 83 D.P.R. 45 (1961).

Al evaluar toda la prueba reconocemos que en última instancia, en este tipo de controversia, cualquier decisión dependerá del sentido común del juzgador y de sus experiencias sobre las inferencias que se puedan hacer de las circunstancias fácticas del accidente. *Cf. McCormick, Evidence,* Cap. 36, Sec. 338, págs. 952, 954 (3ra ed. 1984).

Un examen de la prueba documental nos ha convencido que este accidente automovilístico ocurrió como consecuencia de la interacción de varios factores, entre los que se incluye la negligencia del conductor, y no exclusivamente a las condiciones de la carretera. Los caminos rurales aislados, estrechos, y carentes de iluminación requieren mayor cuidado en el manejo de un vehículo conducido a velocidad moderada y este tipo de accidente no pudo ser el resultado de una sola causa.

Por esas razones, acogemos la petición del Estado de que se "reduzca" el porcentaje de responsabilidad impuesta al Estado por el tribunal sentenciador. Al modificar la sentencia del tribunal a quo, adjudicamos lo que corresponde en derecho y también cumplimos fielmente con nuestra obligación de hacer justicia.